minor children. We therefore vacate that portion of the sentence of probation which prohibits Rieger from having any contact with Vreeland and remand the cause to the district court with directions to remand it to the county court with instructions to resentence Rieger in conformity with this opinion. The sentence is affirmed in all other respects.

Sentence vacated in part, and cause remanded with directions.

Kenneth C., appellant, v.
Lacie H., appellee.
___ N.W.2d ___

Filed November 8, 2013.    No. S-12-1160.

1. **Juvenile Courts: Evidence: Appeal and Error.** Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings. However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the district court observed the witnesses and accepted one version of the facts over the other.

2. **Parental Rights: Evidence: Proof: Words and Phrases.** The grounds for terminating parental rights must be established by clear and convincing evidence, which is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of the fact to be proved.

3. **Parental Rights: Abandonment: Intent: Proof.** Whether a parent has abandoned a child within the meaning of Neb. Rev. Stat. § 43-292(1) (Cum. Supp. 2012) is a question of fact and depends upon parental intent, which may be determined by circumstantial evidence.

4. **Parental Rights: Abandonment: Words and Phrases.** Abandonment is a parent's intentionally withholding from a child, without just cause or excuse, the parent's presence, care, love, protection, maintenance, and the opportunity for the display of parental affection for the child.

5. **Parental Rights: Abandonment: Proof.** To prove abandonment in determining whether parental rights should be terminated, the evidence must clearly and convincingly show that the parent has acted toward the child in a manner evidencing a settled purpose to be rid of all parental obligations and to forgo all parental rights, together with a complete repudiation of parenthood and an abandonment of parental rights and responsibilities.

6. **Parental Rights: Abandonment: Time.** The time period for calculating the 6-month period of abandonment specified in Neb. Rev. Stat. § 43-292(1) (Cum. Supp. 2012) is determined by counting back 6 months from the date the juvenile petition was filed.

7. **Parental Rights: Abandonment.** Abandonment is not an ambulatory thing the legal effects of which a parent may dissipate at will by token efforts at reclaiming a discarded child.
8. **Parent and Child.** Parental obligation requires a continuing interest in the child and a genuine effort to maintain communication and association with that child.
9. **Juvenile Courts: Parental Rights.** A juvenile's best interests are a primary consideration in determining whether parental rights should be terminated as authorized by the Nebraska Juvenile Code.
10. **Parental Rights.** Parental rights constitute a liberty interest.
11. ____. A parent's interest in the accuracy and justice of the decision to terminate his or her parental rights is a commanding one.
12. **Parental Rights: Juvenile Courts: Pleadings.** Because the primary consideration in determining whether to terminate parental rights is the best interests of the child, a court should have at its disposal the necessary information regarding the minor child's best interests, regardless of whether the information refers to a time period before or after the filing of the termination petition.

Appeal from the District Court for Madison County: Robert B. Ensz, Judge. Reversed and remanded for further proceedings.

Kathleen Koenig Rockey, of Copple, Rockey, McKeever & Schlecht, P.C., L.L.O., for appellant.

Mark A. Keenan, of Keenan Law, P.C., L.L.O., for appellee.

Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

Stephan, J.
This appeal from an order terminating a father's parental rights comes to us in an unusual context. It began as a paternity action initiated by the father, although there is no actual dispute regarding paternity. The child in question, K.H., was born in August 2007. His birth certificate identifies appellant Kenneth C. as his biological father and appellee Lacie H. as his biological mother. Kenneth and Lacie never married, and they lived together for only about 2 months after K.H. was born.

In 2011, Kenneth filed a paternity action in the district court for Madison County. He sought an order declaring him to be the biological father of K.H. and awarding him visitation with K.H. Lacie filed an answer alleging that Kenneth's paternity claim was barred by the statute of limitations. In

a counterclaim, she asked the court to terminate Kenneth's parental rights based on abandonment. The court determined Kenneth's paternity claim was not barred by the statute of limitations and ultimately entered an order terminating Kenneth's parental rights. Kenneth perfected a timely appeal from that order, which we moved to our docket on our own motion pursuant to our statutory authority to regulate the caseloads of the appellate courts of this state.[1]

## BACKGROUND

Actions to determine paternity and parental support are governed by Neb. Rev. Stat. §§ 43-1401 through 43-1418 (Reissue 2008). Section 43-1411.01(1) confers jurisdiction on the district courts to adjudicate such actions, but § 43-1411.01(2) provided at the time of the court's order that "[w]henever termination of parental rights is placed in issue in any case arising under sections 43-1401 to 43-1418, subsection (5) of section 42-364 and the Parenting Act shall apply to such proceedings." Neb. Rev. Stat. § 42-364 (Cum. Supp. 2012) governs child support, child custody, and visitation in domestic relations actions.

Because the counterclaim sought termination of Kenneth's parental rights, the district court was initially required to follow the procedures outlined in § 42-364(5)(a), which provided in part that "[t]he court shall transfer jurisdiction to a juvenile court established pursuant to the Nebraska Juvenile Code unless a showing is made that the . . . district court is a more appropriate forum." In an order entered on December 12, 2011, the district court determined that the statute of limitations set forth in § 43-1411 was not applicable to Kenneth's paternity claim and that because the case did "not appear to involve any of the resources normally used in the juvenile court system," the district court was the more appropriate forum for resolution of the issues presented. Neither party has assigned error with respect to this determination.

Section 42-364(5)(a) further required that if a district court does not transfer an action seeking termination of parental

[1] Neb. Rev. Stat. § 24-1106 (Reissue 2008).

rights, the court "shall appoint an attorney as guardian ad litem to protect the interests of any minor child." On December 12, 2011, the district court appointed attorney R.D. Stafford "as guardian ad litem for the minor child to investigate the facts and learn where the welfare of the minor child lies, and to submit a report of these facts based on the best interests of the minor child."

Having completed these preliminary matters, the district court conducted an evidentiary hearing on the issue of whether Kenneth's parental rights should be terminated. Pursuant to the version of § 42-364(5)(a) then in effect, a court

> may terminate the parental rights of one or both parents after notice and hearing when the court finds such action to be in the best interests of the minor child, as defined in the Parenting Act, and it appears by the evidence that one or more of the grounds for termination of parental rights stated in section 43-292 exist[.]

Here, the only alleged statutory ground for termination was that defined by Neb. Rev. Stat. § 43-292(1) (Cum. Supp. 2012), i.e., that Kenneth had "abandoned [K.H.] for six months or more immediately prior to the filing of the petition." The hearing focused on that allegation.

Kenneth testified that he grew up in a family in which he and his siblings were neglected and abused by their parents and that he spent time in foster care from the age of 14 until he graduated from high school. He has received treatment for mental health issues, including suicidal thoughts, anger, and dealing with emotions. Kenneth and Lacie lived together in Norfolk, Nebraska, in 2006. In December of that year, Lacie told Kenneth she was pregnant. Although their relationship was sporadic, they were living together when K.H. was born in August 2007 and Kenneth was present for the birth. He testified that within 2 months of the birth, Lacie became distant and did not want anything to do with him.

Lacie testified that in late October 2007, Kenneth pushed her over a bed and held a knife to her in the presence of the baby. Lacie left and went to stay with her mother. Kenneth contacted her on October 29, and she told him the relationship was over. When Lacie returned to the apartment on October 31, she

found Kenneth in the bathroom. He had shaved his head and cut himself, carving out "'I am sorry, Lacie'" on his leg. Lacie stated that Kenneth had previously cut himself with kitchen knives on several occasions. As Lacie started to drive away from the apartment building, Kenneth grabbed the car door and Lacie said she had to brake quickly to avoid running over him. Kenneth claimed Lacie intentionally tried to hit him with the car. On November 1 and 2, Kenneth sent Lacie text messages threatening suicide if she did not call him.

Kenneth claimed he had attempted to keep in contact with Lacie and K.H. and that he asked a family friend to give Lacie some diapers and a Christmas tree in 2007. He testified that when he asked to see K.H. early in 2008, Lacie told him he would need to obtain a court order for visitation.

Several e-mail messages between Lacie and Kenneth were introduced into evidence. On January 15, 2008, Lacie wrote that she wanted K.H. to see Kenneth and be a part of his life, "but mom said she will stop helping me if you have anything to do with us." She wrote, "If i [sic] let you see [K.H.] without going to court my mom would kill me. . . . If you want [K.H.] on the weekends that is fine with me if the courts will let you." On February 13, Kenneth wrote to Lacie that he had had a heart attack and had asked for her and K.H. while he was in the hospital. Lacie wrote to Kenneth on February 14 and asked what had caused his heart attack. No response is included in the record.

Lacie testified that in February 2008, she and Kenneth agreed it would be best for him to terminate his parental rights to K.H. and that Kenneth agreed to talk to a lawyer about signing a relinquishment of his parental rights. He apparently never took any further action in this regard, and he disputes Lacie's assertion that he signed an informal relinquishment document. No such document is in the record.

In March 2008, Lacie sought a protection order against Kenneth, alleging that he had been sending her text messages and telephoning her, threatening to commit suicide if she did not call him back. Because he mentioned Christmas lights she had on her balcony, Lacie believed he had been watching her apartment, and she said she was afraid to go outside. The

order was entered on March 18 and was to be in effect for 1 year. At the same time, Kenneth filed for a protection order against Lacie, but his complaint was dismissed.

Kenneth did not violate the protection order, and Lacie did not hear from him for its duration of 1 year. Kenneth moved to North Loup, Nebraska, where he lived with an uncle and worked at a hog confinement facility. In March 2009, he moved to Wyoming, where he worked in road construction. He testified that while in Wyoming, he called Lacie's mother to ask what he needed to pay for child support and she told him he should terminate his parental rights and "walk away." Kenneth offered telephone records to show that he contacted Lacie's mother on multiple occasions, but he often was able to only leave a message. Kenneth also testified that he left money or gifts for K.H. in Lacie's mother's mailbox or at her home. In May 2009, 2 months after the protection order expired, Kenneth called Lacie at work, but she refused to talk to him.

Kenneth testified that in May 2009, he contacted the "child support network" in Lincoln, Nebraska, to make arrangements to pay child support but that he never submitted the forms provided by the "network."

At the time of the hearing, Kenneth was living with a woman who was in the process of obtaining a divorce. The woman testified that she has three young children and that Kenneth is "an amazing person" around her children.

Lacie testified that she sought termination of Kenneth's parental rights due to his mental instability, inability to maintain employment, and failure to provide support. She stated that K.H. does not know Kenneth but that K.H. has a "father figure" in Lacie's fiance, whom he calls "dad." Lacie expressed her opinion that termination of Kenneth's parental rights was in K.H.'s best interests.

Stafford, the guardian ad litem, testified that in his opinion, termination of Kenneth's parental rights was in K.H.'s best interests, primarily due to the fact that there had been no contact between Kenneth and K.H. for most of K.H.'s life. Stafford based his opinion on interviews with Kenneth, Lacie, Lacie's mother, and other friends and relatives of both parties.

Stafford did not talk to K.H. or meet Lacie's fiance, and he did not observe any interaction between Lacie's fiance and K.H. Stafford had no opinion as to either parties' parenting skills or abilities. He said he could not make a psychological assessment as to any potential harm to K.H. if he were to have contact with Kenneth. Stafford based his opinion regarding the best interests of K.H. solely upon the passage of time and Kenneth's failure to seek contact with Lacie and K.H. after expiration of the protection order in March 2009.

The district court entered an order terminating Kenneth's parental rights. The court found that Kenneth had had no contact with K.H. since October 23, 2007, less than 2 months after he was born, and that Kenneth had had no contact with Lacie since May 2009. Regarding the conflicting evidence as to Kenneth's efforts to reestablish contact with K.H., the court concluded that Kenneth had abandoned K.H., noting:

> The clear evidence is that [Kenneth] had no contact, and his efforts, even if made, were insubstantial. He never followed through with anything that he claims to have done, including completing and returning child support documents that he had received from the State at his request.
>
> . . . .
>
> The credible evidence is that for nearly two and a half years prior to the filing of the complaint, [Kenneth] had no contact with [K.H.], paid no child support, and did not inquire as to [K.H.'s] well-being.

In concluding that termination of Kenneth's parental rights would be in the best interests of K.H., the district court reasoned that K.H. "has had no contact with [Kenneth] during [K.H.'s] cognizant life. They have no relationship. The court finds that the general health, welfare, and social behavior of [K.H.] will be best served by not now injecting [Kenneth] into [K.H.'s] life in which [Kenneth] has never existed."

## ASSIGNMENTS OF ERROR

Kenneth assigns that the district court abused its discretion in finding that he had abandoned K.H., in determining that his parental rights should be terminated, and in finding

that it was in the best interests of K.H. that Kenneth's rights be terminated.

## STANDARD OF REVIEW

[1] Although this is not a typical juvenile case governed exclusively by the Nebraska Juvenile Code,[2] the district court was required to apply the provisions of § 43-292 in order to determine whether Kenneth's parental rights should be terminated. Accordingly, the standard of review applicable to juvenile cases is applicable here. Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings.[3] However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the district court observed the witnesses and accepted one version of the facts over the other.[4]

## ANALYSIS

[2] The grounds for terminating parental rights must be established by clear and convincing evidence, which is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of the fact to be proved.[5] With this principle in mind, we examine Kenneth's arguments that the evidence was insufficient to establish either that he abandoned K.H. or that termination of his parental rights would be in K.H.'s best interests.

### ABANDONMENT

[3-5] Whether a parent has abandoned a child within the meaning of § 43-292(1) is a question of fact and depends upon parental intent, which may be determined by circumstantial

---

[2] See Neb. Rev. Stat. §§ 43-245 to 43-2,127 (Reissue 2008 & Cum. Supp. 2012).

[3] *In re Interest of Karlie D.*, 283 Neb. 581, 811 N.W.2d 214 (2012); *In re Interest of Chance J.*, 279 Neb. 81, 776 N.W.2d 519 (2009).

[4] *Id.*

[5] *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005). See, also, *In re Interest of Shelby L.*, 270 Neb. 150, 699 N.W.2d 392 (2005).

evidence.[6] Abandonment is a parent's intentionally withholding from a child, without just cause or excuse, the parent's presence, care, love, protection, maintenance, and the opportunity for the display of parental affection for the child.[7] To prove abandonment in determining whether parental rights should be terminated, the evidence must clearly and convincingly show that the parent has acted toward the child in a manner evidencing a settled purpose to be rid of all parental obligations and to forgo all parental rights, together with a complete repudiation of parenthood and an abandonment of parental rights and responsibilities.[8]

[6] In juvenile cases, the time period for calculating the 6-month period of abandonment specified in § 43-292(1) is determined by counting back 6 months from the date the juvenile petition was filed.[9] Here, the district court computed the 6-month period from October 5, 2011, the date on which Kenneth filed his complaint, and neither party assigns or argues that this is not the appropriate time period. The record clearly shows that Kenneth had no personal contact with K.H. during this time. In fact, his only direct contact with K.H. was during the 2 months immediately after his birth, approximately 4 years before Kenneth filed his complaint. And Kenneth had no contact with Lacie with regard to K.H. after May 2009, almost 2½ years before the complaint was filed.

[7,8] There is disputed evidence regarding Kenneth's attempts to establish contact with Lacie and K.H. after their separation in October 2007. While Kenneth claims he made a number of telephone calls to Lacie's mother, sent money to Lacie or her mother, and tried to provide gifts for K.H., Lacie and her mother testified that he made no such efforts. It is undisputed that Kenneth has never paid child support, despite obtaining the legal forms necessary to do so. We agree with the observation of the district court that Kenneth's efforts

---

[6] See *In re Interest of Chance J., supra* note 3.

[7] See *id.*

[8] *Id.*

[9] See *id.*

to establish contact with K.H., even if made, were insubstantial. In cases involving similar factual circumstances, we have stated that abandonment is not an ambulatory thing the legal effects of which a parent may dissipate at will by token efforts at reclaiming a discarded child.[10] Parental obligation requires a continuing interest in the child and a genuine effort to maintain communication and association with that child.[11] Kenneth's sporadic, insubstantial efforts to establish a relationship with his son, coupled with his complete failure to provide financial support, constitute clear and convincing evidence of abandonment.

### Best Interests

Even after properly finding grounds for abandonment, the district court could not terminate Kenneth's parental rights unless such action was "in the best interests of the minor child, as defined in the Parenting Act."[12] The Parenting Act[13] defines "[b]est interests of the child" as "the determination made taking into account the requirements stated in section 43-2923."[14] Section 43-2923 addresses the best interests of a child in the context of parenting, visitation, and custody arrangements within an intact parental relationship. It includes a list of five nonexclusive factors which a court is to consider in making this determination.

The first factor is "[t]he relationship of the minor child to each parent prior to the commencement of the action . . . ."[15] As noted, Kenneth and K.H. have had no relationship whatsoever since October 2007, when K.H. was approximately 2 months old. This was the principal basis for the opinion of the

---

[10] *In re Adoption of David C.*, 280 Neb. 719, 790 N.W.2d 205 (2010); *In re Interest of Sunshine A. et al.*, 258 Neb. 148, 602 N.W.2d 452 (1999).

[11] See *id.*

[12] § 42-364(5)(a). See, also, *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010).

[13] Neb. Rev. Stat. §§ 43-2920 to 43-2943 (Reissue 2008 & Cum. Supp. 2012).

[14] § 43-2922(3).

[15] § 42-2923(6)(a).

guardian ad litem that termination of Kenneth's parental rights would be in K.H.'s best interests. In contrast, K.H. appears to have a good relationship with Lacie.

The second factor is "[t]he desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning."[16] The record provides no basis to evaluate this factor. Because K.H. is unaware of his biological father, he would have no basis for expressing his "desires and wishes" regarding a relationship with Kenneth.

The third factor is "[t]he general health, welfare, and social behavior of the minor child."[17] The record shows that, at least in Lacie's opinion, K.H. is developing normally in her care, despite Kenneth's prolonged absence from his life. Lacie testified that K.H. is a well-behaved child with no ongoing medical needs and that he is "on target educationally." However, the guardian ad litem did not talk to K.H. and there was no other evidence as to his health, welfare, and behavior.

The fourth factor is "[c]redible evidence of abuse inflicted on any family or household member."[18] And the fifth factor is "[c]redible evidence of . . . domestic intimate partner abuse."[19] Kenneth's conduct while he and Lacie lived together before and after the birth of K.H. would constitute both domestic intimate partner abuse and abuse inflicted on a household member under the definitional provisions of the Parenting Act.[20] Lacie described the relationship as "terrifying." She described multiple incidents when Kenneth cut himself with kitchen knives or wrapped a belt or strap around his neck as if to strangle himself. These incidents occurred in or near the parties' apartment, both before and after the birth of K.H. She also described an incident on October 23, 2007, when Kenneth

---

[16] § 42-2923(6)(b).

[17] § 42-2923(6)(c).

[18] § 43-2923(6)(d).

[19] § 43-2923(6)(e).

[20] See § 43-2922(8) and (10). See, also, Neb. Rev. Stat. § 42-903 (Cum. Supp. 2012) (incorporated by reference in §§ 43-2922(8) and 43-2923(6)(d)).

pushed her down and threatened her with a knife in the presence of K.H.

After Kenneth left foster care at the age of 18, he reunited with his biological mother. She obtained a protection order against him in 2006, so he moved in with Lacie and her mother for about 1 month in the summer of 2006. He denied any self-destructive behavior in Lacie's presence. He claimed that Lacie attempted to run him over with her vehicle, but Lacie denies this allegation. Based upon our de novo review of the entire record, we conclude that there is credible evidence of abusive behavior on the part of Kenneth, including abuse directed at Lacie, and little credible evidence of abusive behavior on the part of Lacie. There is no evidence that Kenneth ever abused K.H.

If this were a custody dispute, we would agree that consideration of these factors and the evidence would support a finding that it is in the best interests of K.H. to remain in the sole legal and physical custody of Lacie. But Kenneth does not seek custody. He seeks only visitation and the preservation of his parental rights. In such a context, the nonexhaustive nature of the factors listed in § 43-2923(6) is particularly relevant, and we do not limit our analysis to only those factors.

[9-11] It is well established that a juvenile's best interests are a primary consideration in determining whether parental rights should be terminated as authorized by the Nebraska Juvenile Code.[21] It is also well established that parental rights constitute a liberty interest.[22] As the U.S. Supreme Court has noted, "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it."[23] Thus, "until the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural

---

[21] *In re Interest of Sir Messiah T. et al., supra* note 12; *In re Interest of Aaron D., supra* note 5.

[22] See *Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000).

[23] *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982).

relationship."[24] That is no less true where, as here, one parent asks a court to terminate the other parent's rights with respect to their child. A parent's interest in the accuracy and justice of the decision to terminate his or her parental rights is a commanding one.[25]

As we have noted, termination of parental rights requires proof of two elements: (1) that one or more statutory grounds for termination exist and (2) that termination would be in the best interests of the child. Statutory grounds are based on a parent's past conduct, but the best interests element focuses on the future well-being of the child. While proof of the former will often bear on the latter, a court may not simply assume that the existence of a statutory ground for termination necessarily means that termination would be in the best interests of the child. Rather, that element must be proved by clear and convincing evidence.

There is ample evidence in the record that Kenneth has not fulfilled his parental obligations to K.H. in the past. But there is almost no evidence upon which we can make a principled determination of whether the current circumstances are such that termination of Kenneth's parental rights would be in the child's best interests. For example, one reason Lacie sought termination of Kenneth's parental rights was because of his "mental instability." But she acknowledged at trial that this was based on his behavior during and prior to their relationship, and she had no information about his present mental health. The record contains no professional psychological assessment of Kenneth upon which to assess his current or future parenting capability. Although Kenneth's prior behavior provides cause for concern, there is no clear and convincing evidence that he is presently unfit as a parent due to "mental instability."

The opinion of the guardian ad litem that termination of Kenneth's parental rights would be in the best interests of K.H. was based primarily upon the "passage of time" during

---

[24] *Id*., 455 U.S. at 760.

[25] *In re Interest of Aaron D*., *supra* note 5; *In re Interest of Kassara M*., 258 Neb. 90, 601 N.W.2d 917 (1999).

which Kenneth had no contact with the child. The guardian ad litem was unable to render an opinion concerning the parenting skills of either Kenneth or Lacie. Stafford did not interview K.H. or Lacie's fiance or observe the fiance's interaction with K.H. And Stafford specifically stated that he could not give a psychological opinion about any impact on K.H. if Kenneth is allowed into his life. Stafford did not visit Kenneth in his current home, but based his opinion on a previous residence. Stafford also acknowledged that if resources were available, experts could be utilized to minimize any adverse effects of visitation on a supervised basis. Although Kenneth is currently a stranger to K.H., that fact alone does not establish that there could not be a paternal relationship which would be beneficial to K.H.

In cases where a child has been in foster care for an extended period of time while a parent has unsuccessfully dealt with issues of fitness, we have cited the child's need for permanency as a basis for concluding that termination of parental rights was in the child's best interests.[26] But that is not an issue of the same magnitude in this case, because K.H. will have permanency with Lacie, regardless of whether Kenneth's parental rights are terminated. And Kenneth's stated willingness to provide financial support to K.H., despite his past failure to do so, can only be viewed as a factor which must be weighed against termination of his parental rights.

[12] As we stated in *In re Interest of Aaron D.*,[27] the primary consideration in determining whether to terminate parental rights is the best interests of the child. To make such a determination, a court should have at its disposal the necessary information regarding the minor child's best interests, regardless of whether the information refers to a time period before or after the filing of the termination petition. In that case, while there was evidence which raised doubt about a mother's ability to be an effective parent, we held that the

---

[26] See, e.g., *In re Interest of Kendra M. et al.*, 283 Neb. 1014, 814 N.W.2d 747 (2012); *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012).

[27] *In re Interest of Aaron D., supra* note 5.

State had failed to prove that termination of her parental rights would be in the child's best interests, noting that there was no testimony from therapists, family support workers, or other persons who were "most able to testify as to [the child's] condition, circumstances, and best interests, both before and after the filing of the termination petition."[28] Indeed, we noted that the "only expert testimony present in the record pertinent to how termination would affect [the child] indicated that he would be harmed by the termination of [the mother's] parental rights."[29]

In this case, the record discloses that K.H.'s unmarried parents had a brief, stormy relationship followed by almost 4 years during which Kenneth had no contact with and provided no financial support for K.H. But it provides no evidence that Kenneth is currently unfit to be a parent and no explanation of how K.H.'s interests would be served by judicial foreclosure of any future relationship with and support from Kenneth, both of which Kenneth now says he is ready to provide. Nor is there any evidence of a likelihood that K.H. would be harmed by the relationship and visitation which Kenneth now seeks. Accordingly, we conclude that Lacie did not meet her burden of presenting clear and convincing evidence that termination of Kenneth's parental rights would be in the best interests of K.H.

## CONCLUSION

For the reasons discussed herein, the judgment of the district court is reversed and the cause is remanded for further proceedings.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.

HEAVICAN, C.J., not participating.

---

[28] *Id*. at 263, 691 N.W.2d at 175.

[29] *Id*. at 266, 691 N.W.2d at 177.