IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

MORSE V. OLMER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

AARON M. MORSE, APPELLANT,

V.

KAYLEE OLMER, APPELLEE.

Filed December 26, 2024.    No. A-23-1028.

Appeal from the District Court for Platte County: JASON M. BERGEVIN, Judge. Affirmed.

Jack W. Lafleur, of Moyer, Moyer & Lafleur, for appellant.

Erik C. Klutman, of Sipple, Hansen, Emerson, Schumacher, Klutman & Valorz, L.L.C., for appellee.

RIEDMANN, Chief Judge, and MOORE and WELCH, Judges.

MOORE, Judge.

## INTRODUCTION

Kaylee Olmer appeals from the order of the District Court for Platte County denying her petition to terminate the parental rights of Aaron M. Morse. Upon our de novo review of the record, we conclude that Olmer failed to prove by clear and convincing evidence that Morse was an unfit parent and that it was in the child's best interests to terminate Morse's parental rights. We therefore affirm.

## STATEMENT OF FACTS

Olmer and Morse are the biological parents of Lily, born in August 2017.

On March 31, 2022, Olmer filed a complaint to modify and a petition to terminate Morse's parental rights pursuant to Neb. Rev. Stat. § 42-364(5) (Cum. Supp. 2022). The petition alleged that the district court had previously entered an order determining Morse's paternity and awarding

legal and physical custody of Lily to Olmer. The petition further alleged that in October 2020, Morse was sentenced to a term of 5 to 8 years' imprisonment; Morse has had no contact with Lily since March 2019; by Morse's own actions, he had voluntarily chosen to place himself in a position where he fails and refuses to provide for Lily's needs; he was an unfit parent; and termination of Morse's parental rights was in Lily's best interests.

A trial on the matter was held over 2 days in May and July 2023. Morse was incarcerated at the time of trial but appeared both days via Zoom videoconference. The following evidence was adduced.

Olmer and Morse were teenagers in a dating relationship when Olmer became pregnant with Lily. Together, Olmer and Morse selected Lily's name. Morse attended some of Olmer's prenatal medical appointments and was present in the delivery room at Lily's birth.

Since Lily's birth, Olmer and Lily have resided with Olmer's parents at their home. Olmer has always been Lily's primary caregiver. Morse would go to Olmer's residence on a regular basis when Lily was a newborn. Morse testified that during this time he would change Lily's diaper, feed Lily, play with Lily, and help with the laundry. On the other hand, Olmer and her parents observed Morse to have very little interaction with Lily when he was at the Olmer residence following Lily's birth, frequently handing Lily off to Olmer or sleeping. Olmer and her parents also testified that Morse was more interested in pursuing a sexual relationship with Olmer rather than caring for Lily.

Morse was involved with various events in Lily's early life. He and his immediate family members were present at Lily's baptism and attended the reception afterwards. Morse attended Lily's first birthday party, gifting her a stuffed bunny. Olmer and Lily also accompanied Morse to significant Morse family events, including his sister-in-law's college graduation and his brother's wedding.

Morse also participated in Lily's holiday events. Morse and Olmer celebrated Lily's first Halloween together, dressing up in a family costume and going trick or treating. On Lily's first Christmas, Morse had Lily over at his parents' house, where he resided, for 4 hours. He gifted her a bouncer and a portable crib.

Olmer testified to instances during their relationship where Morse would raise his voice at Olmer, causing her fear. In July 2018, Olmer's father observed Morse grab ahold of Olmer's arm and squeeze it. Olmer's mother testified that during the same time, she observed Morse grab Olmer's arm and be physically aggressive toward Olmer repeatedly. Morse denied ever being physical with Olmer.

Also in July 2018, Olmer's father asked Morse to promise that he would never be in trouble again or he would be barred from the Olmer residence. Morse, who was 16 years old at the time, advised Olmer's father he could not say with certainty that he would not get into trouble again. Olmer's mother was aware of the conversation and testified consistently with Morse. Morse testified that following the conversation, he was not allowed at the Olmer residence, where all his visits with Lily had been occurring, and he and Olmer had to end their relationship.

Olmer's father also told Morse that "if he continued to be getting in trouble and continued down the path he was going to be, he was going to become a felon. And once he becomes a felon, I do not allow felons in my house." Morse had never again asked to come inside the home, and Olmer's father testified that he "probably wouldn't allow [Morse] in my house."

Following the July 2018 conversation with Olmer's father, Morse stopped having regular visits with Lily at the Olmer residence. Olmer and her family decided that all visits would occur weekly at a fast-food restaurant in town. Olmer's parents transported Lily to the restaurant and sat a few tables away while Lily spent roughly 2 hours with Morse and his parents. Both Olmer's parents testified that at times Morse would be late to the visits, leave the visits early, and spend a large portion of the visits in the bathroom. According to Olmer's parents, Morse's parents were more involved with Lily during the restaurant visits than Morse was himself.

Morse testified that because the restaurant visits occurred around Lily's bedtime, Lily was cranky, falling asleep, and did not want to be held. Morse's mother testified that the visits at the restaurant were "not a relaxed situation for anyone, including Lily." Morse's mother described having to play with Lily on the dirty floor of the restaurant. Morse and his parents raised issues about the location of the visits and offered to have them at their church's nursery, which the Olmers declined based on concerns that the church was not a public place. Olmer was concerned for Lily's safety and "afraid [Morse] was going to take off with her."

On September 7, 2018, Morse filed a petition to establish paternity and custody. On December 14, 2018, the district court awarded Olmer temporary legal and physical custody of Lily. Morse was granted supervised parenting time on alternating Saturdays and Sundays from 9 a.m. to 5 p.m. Morse was also ordered to pay a $55 monthly child support obligation.

Morse exercised these visitations at his parents' home until March of 2019. Morse described caring for Lily, playing games with her, and showing her the family's animals during the visits in his family's home. Morse's mother testified that they had furnished and decorated a room for Lily in their home and photographs of the room were entered into evidence. During these weekend visits, Olmer and her mother observed Lily to be struggling with transitions and exhibiting signs, such as night terrors and outbursts, when she returned from visits with Morse.

On March 14, 2019, Olmer filed a motion for an ex parte order to suspend visits with Morse. The motion references "reasons given in the Affidavit attached . . ." However, only the motion was offered at trial and the affidavit does not appear elsewhere in our record. That same day, an ex parte order was entered, temporarily suspending Morse's visitation rights. On April 29, 2019, the ex parte order was affirmed and all of Morse's visits were suspended until further order of the court.

On January 13, 2020, the district entered an order further suspending Morse's visits with Lily based on a stipulation between the parties. Morse testified that he was advised by his counsel at the time that he would not be regaining his visitation rights "any time soon," and the issue could be "revisited whenever . . ." Attached to the order was a parenting plan which stated that Morse's "parenting time shall remain suspended until his proper application and further order of the Court." The parenting plan is silent as to Morse's rights to telephone or video contact with Lily and Morse believed that the order disallowed any kind of communication with Lily. The order also suspended Morse's child support obligation commencing January 1, 2020.

Morse testified that he made some child support payments in 2019 while he was in high school and working at a part-time fast-food job. A Department of Health and Human Services payment history report reflects that Morse's last child support payment was on March 1, 2019, in the amount of $22.50. Morse was in arrears in the amount of $495 at the time that his child support

obligation was suspended. Olmer and her parents have been financially responsible for meeting Lily's needs since her birth.

On April 29, 2020, Morse was arrested for various criminal offenses, and he was ultimately convicted of theft by receiving stolen property, a Class IV felony; possession of a controlled substance, a Class IV felony; and attempt of a Class II felony (attempted possession of a firearm during commission of a felony), a Class IIA felony. Morse was later charged with and convicted of escape, a Class III felony, after he did not return to the detention facility at the conclusion of a furlough. On October 13, 2020, Morse was sentenced in both cases to a total of 5 to 8 years' imprisonment. A printout from the Nebraska Department of Correctional Services was received by the district court and reflects that Morse became parole eligible on October 27, 2022, and his projected release date is September 19, 2025.

Morse has not seen Lily since March 2019 when she was approximately 18 months old. Except for the short time when he escaped, Morse has been incarcerated since April 2020. Morse testified that he has not requested visitation with Lily while he has been incarcerated because his visitation was suspended by court order, and "[b]ecause I don't want her to see me like this. And I don't think that this is a good environment." Morse explained that he was concerned about Lily "going through the buzzers and then the searches," and seeing Morse in a prison uniform.

Morse testified that while incarcerated, he wrote many letters to Olmer but mailed only two. The two letters were received into evidence. In a letter dated March 7, 2022, Morse stated that he loves Lily and wants her to be a part of his life. In another letter dated March 23, 2023, Morse restated his intentions to remain connected to Lily.

Morse also testified that he has mailed Lily at least three cards since he has been incarcerated, including a card for her fifth birthday. Olmer testified that she had not received any cards, gifts, or mail from Morse to Lily during his incarceration.

Since Morse has been incarcerated, he has obtained his General Education Diploma with honors and completed several voluntary programs. The programs include a violence reduction program and Thinking for a Change, which have helped Morse to "identify triggers as well as motivating factors behind what decisions have led you to your incarceration and considering the outcome of your actions before making them." Morse has also completed intensive outpatient treatment for his substance use and a program focused on the creation of healthy habits and support systems.

Religion has become a focus of Morse's life since his incarceration. He prays daily and attends a weekly church service. Morse's mother attributed Morse's religion to the "huge, huge change" she has seen in him.

At the time of trial, Morse was 21 years old and had set goals for himself upon his release from incarceration including to maintain his sobriety, join a church community, obtain employment, and take care of Lily. Morse testified that he loves Lily, thinks about her daily, and wants to be a part of her life. Morse is aware that he cannot immediately be a part of Lily's life and acknowledged that Lily does not know who he is. Morse expressed a willingness to participate in therapeutic visits to reintroduce Lily to him and allow her to be comfortable with him again.

Olmer believes that it is in Lily's best interests to terminate Morse's parental rights based on Morse's substance use, incarceration, and Lily's behavior when she had to attend visits with

Morse. Olmer described Lily as "traumatized" based on Lily crying and exhibiting distress during the period she had visits with Morse.

A report authored by Lily's court-appointed guardian ad litem (GAL) was received into evidence. The GAL interviewed Lily, who was 5 years old at the time. During their conversation, Lily stated that she did not remember her father and could not recall his name. When asked if she wants to talk to her father or see him, Lily initially said she did not want to, but that she does not know why. Lily indicated that it makes her nervous to think about meeting her father. At another point in the conversation, Lily said she would be willing to talk to her father on the phone, but not see him. Later, she said it would feel good to see her father and her paternal grandparents again. The GAL concluded in her report that Lily has conflicting thoughts and emotions about speaking with or spending time with Morse.

The GAL testified at trial that when speaking with Morse, Morse indicated that he would be willing to participate in therapeutic visitation or family therapy with Lily. Morse had also told the GAL that he did not want to relinquish his parental rights to Lily.

An order denying Olmer's complaint to modify and petition to terminate was entered on November 17, 2023. The district court noted that the petition to terminate Morse's parental rights alleged that termination was proper under Neb. Rev. Stat. § 43-292(1), (2), (3), (4), and (9) (Reissue 2016). The court found that clear and convincing evidence supported three of the statutory grounds for termination alleged by Olmer: that Morse had abandoned Lily under § 43-292(1); that he had substantially and continuously or repeatedly neglected and refused to give Lily necessary care and protection under § 43-292(2); and Morse had subjected Lily to abandonment, an aggravated circumstance under § 43-292(9).

The district court further found there was not clear and convincing evidence that Morse had willfully neglected to provide Lily the necessary subsistence, education, or other care necessary for their health, morals, or welfare under § 43-292(3). Based on Morse's singular conviction for possession of a controlled substance and no other evidence of habitual substance use, the court found that there was not clear and convincing evidence that he was "unfit by reason of debauchery, habitual use of intoxicating liquor or narcotic drugs, or repeated lewd and lascivious behavior, which conduct is found by the court to be seriously detrimental to the health, morals, or well-being" of Lily for purposes of § 43-292(4).

Having found statutory grounds for termination, the district court proceeded to analyze whether termination of Morse's parental rights would be in the best interests of Lily. The court noted that Morse has not had contact with Lily since March 2019. The court found that the evidence established that Morse had been an absent parent, but it did not establish that he was unfit. The court observed that Morse had grown while incarcerated and is committed to reestablishing a relationship with Lily. Additionally, Lily had expressed a willingness to talk to Morse. The court concluded that Olmer had not met her burden to prove by clear and convincing evidence that it was in Lily's best interest for Morse's parental rights to be terminated.

An amended order correcting a reference to Olmer's complaint to modify and petition to terminate parental rights was filed on November 20, 2023.

Olmer appeals.

ASSIGNMENT OF ERROR

Olmer assigns that the district court erred by denying Olmer's petition to terminate Morse's parental rights, by failing to find that Morse was an unfit parent, and by failing to find that it was in Lily's best interests to terminate Morse's parental rights.

STANDARD OF REVIEW

Termination of parental rights cases raised under § 42-364(5) are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the lower court's findings. See *Benjamin S. v. Crystal S.*, 313 Neb. 799, 986 N.W.2d 492 (2023). When the evidence is in conflict, the appellate court will consider and give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id*.

ANALYSIS

*Statutory Grounds.*

In actions for termination of parental rights brought under § 42-364(5), the Nebraska Juvenile Code governs the question of termination. *Id*. Under the Nebraska Juvenile Code, terminating parental rights requires both clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and clear and convincing evidence that termination is in the best interests of the children. See § 43-292. See, also, *In re Interest of Donald B. & Devin B.*, 304 Neb. 239, 933 N.W.2d 864 (2019). Clear and convincing evidence means the amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved; clear and convincing evidence is more than a preponderance of the evidence, but less than proof beyond a reasonable doubt. See *In re Interest of Justine J. & Sylissa J.*, 288 Neb. 607, 849 N.W.2d 509 (2014).

The district court found that the Olmer had presented clear and convincing evidence to satisfy § 42-292(1), (2), and (9). Olmer does not challenge the district court's finding that statutory grounds to terminate have been met. However, because our review is de novo, we address this requirement for termination of parental rights.

Section 43-292(2) provides for termination of parental rights where "[t]he parents have substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection[.]" Past neglect, along with facts relating to current family circumstances which go to best interests, are all properly considered in a parental rights termination case under § 43-292(2). *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015). One need not have physical possession of a child to demonstrate the existence of neglect contemplated by § 43-292(2). *In re Interest of Joseph S. et al., supra*. A parent neglects a child by failing to put himself or herself in a position where the child can be placed in the parent's care, in the same manner as a parent who improperly cares for a child in his or her care. See *In re Interest of Gabriel B.*, 31 Neb. App. 21, 976 N.W.2d 206 (2022), citing *In re Interest of J.N.V.*, 224 Neb. 108, 395 N.W.2d 758 (1986). While incarceration alone is not a basis for termination of parental rights, a parent's incarceration may be considered along with other factors in determining whether parental rights can be terminated based on neglect. *In re Interest of Joezia P.*, 30 Neb. App. 281, 968 N.W.2d 101 (2021).

Morse has not had direct contact with Lily since March 2019, at which time Morse's visitation with Lily was suspended by court order. Morse has been incarcerated since April 2020. Morse has also had no alternative type of contact with Lily, including phone or video contact, and did not request visits with Lily during his incarceration as he did not believe prison to be an appropriate place for Lily. He testified to only sending Lily some letters and cards from prison, and he was delinquent in his child support obligation.

Though Morse was involved in caring for Lily and spending meaningful time with her in her early life, and he testified to his present desire to be a part of Lily's life, we find that his absence from Lily's life after March of 2019 demonstrates by clear and convincing evidence that Morse substantially and continuously neglected Lily or failed to provide her with necessary parental care and protection as required by § 43-292(2). Thus, the statutory requirement for termination under § 43-292(2) has been met.

If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). Because Olmer presented clear and convincing evidence that Morse had neglected Lily, statutory grounds for termination of Morse's parental rights exists.

*Best Interests and Unfitness.*

Whereas statutory grounds are based on a parent's past conduct, the best interests inquiry focuses on the future well-being of the child. *Benjamin S. v. Crystal S.*, 313 Neb. 799, 986 N.W.2d 492 (2023). "While proof of the former will often bear on the latter, a court may not simply assume that the existence of a statutory ground for termination necessarily means that termination would be in the best interests of the child." *Kenneth C. v. Lacie H.*, 286 Neb. 799, 811, 839 N.W.2d 305, 314 (2013).

Proving that termination would be in the best interests of the child is a high hurdle because a parent's right to raise his or her children is constitutionally protected. *See In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). See, also, *Kenneth C. v. Lacie H., supra*, citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). There is a rebuttable presumption that it is in the child's best interests to share a relationship with his or her parent. *Benjamin S. v. Crystal S., supra*. In termination proceedings initiated by the State, this presumption can be overcome by proof of parental unfitness. See, *Kenneth C. v. Lacie H., supra*; *In re Interest of Xavier H.*, 274 Neb. 331, 740 N.W.2d 13 (2007). "That is no less true where, as here, one parent asks a court to terminate the other parent's rights with respect to their child." *Kenneth C. v. Lacie H.*, 286 Neb. at 811, 839 N.W.2d at 314. Parental unfitness means a personal deficiency or incapacity that has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and that has caused, or probably will result in, detriment to a child's well-being. *Benjamin S. v. Crystal S., supra*.

The evidence shows that Morse was interested in being a parent during Olmer's pregnancy, at Lily's birth, and for some time after she was born. Morse went to Olmer's residence on a regular basis when Lily was a newborn and he was involved with various events in Lily's early life. Lily attended significant events with Morse's family and Morse participated in Lily's holiday events.

This dynamic changed following Morse's conversation with Olmer's father in July 2018. After that, the Olmers only allowed Morse and his family to see Lily during visits at a fast-food restaurant. Morse then exercised supervised visits with Lily from December of 2018 until March of 2019. It is unclear from our record why Morse's supervised visits were initially suspended. However, since then, he has not had contact with Lily either because his visits were suspended or he thought it was best for Lily to not have contact with him while he is incarcerated. We agree with the district court that the evidence establishes that Morse has been an absent parent, but it does not establish that he is unfit.

Morse has availed himself of many programs while incarcerated. His mother testified that she has seen a change in Morse, and the district court in its order explicitly found that testimony to be credible. Morse has a plan upon his release that is focused on meeting his parental responsibilities. Morse is cognizant of the fact that Lily does not presently know him and is open to therapeutic visits to reestablish a connection with Lily.

Lily reported mixed emotions to the GAL regarding having contact with Morse, including that it would feel good to see Morse again. Based on the rebuttable presumption that it is in the child's best interests to share a relationship with his or her parent, we find that Lily could benefit from a renewed relationship with Morse. See *Benjamin S. v. Crystal S.*, 313 Neb. 799, 986 N.W.2d 492 (2023).

We acknowledge Morse's past mistakes and additionally acknowledge that Morse has had little to no contact with Lily since 2019. On this record, however, we do not attribute the same significance to these facts for purposes of the unfitness or best interests' inquiries that Olmer does. We believe this to be consistent with Nebraska precedent.

In *Kenneth C. v. Lacie H.*, 286 Neb. at 813, 839 N.W.2d at 315, a child's unmarried parents had a "brief, stormy" relationship, in which the father, among other things, held a knife to the mother in the presence of the child. For years afterward, the father had no contact with the child and provided no financial support. When the father later initiated paternity proceedings and requested visitation with the child, the mother asked that the father's parental rights be terminated and prevailed in district court. On appeal, the Nebraska Supreme Court agreed that the mother had demonstrated statutory grounds for termination. The Supreme Court likewise recognized that the father had not fulfilled his parental obligations in the past, that there were concerns about his prior behavior, and that the father was, at that time, a stranger to the child. Even so, the Supreme Court found no evidence that the father was presently unfit and no explanation of how the child's best interests would be served by cutting off the possibility of any future parental relationship.

In *Benjamin S. v. Crystal S., supra*, a father sought to terminate the parental rights of the children's mother by demonstrating that the mother had been absent from the children's lives for over 4 years, had prior drug use and criminal convictions, and continuously failed to meet her child support and other obligations set forth in the parties' divorce decree. The father prevailed in the district court, but on appeal the Nebraska Supreme Court found that in the time following the mother's incarceration, she had made personal improvements such as maintaining sobriety, participating in counseling, and securing employment. Though the mother had not seen the children for some time, the Supreme Court noted that she had expressed interest in seeing the children in both her recently filed complaint to modify and in Facebook messages to the father. And at trial, she expressed regret about her past mistakes and recognized their negative effect on

her relationship with her children. The Supreme Court held that the record lacked evidence of the mother's unfitness as of the time of trial, as well as relatively little evidence that tended to show that termination of the mother's parental rights was in the children's best interests.

Termination of parental rights is final and complete severance of child from parent and removes an entire bundle of parental rights; therefore, with such severe and final consequences, parental rights should be terminated only in absence of reasonable alternative and as last resort. See *In re Interest of Giavonna G.*, 23 Neb. App. 853, 876 N.W.2d 422 (2016). Although statutory grounds exist to terminate Morse's parental rights, we find that Olmer has not met her burden to prove by clear and convincing evidence that it is in Lily's best interest for Morse's parental rights to be terminated.

## CONCLUSION

Because we conclude that there was not clear and convincing evidence that terminating Morse's parental rights was in Lily's best interests, we affirm.

AFFIRMED.