IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

IN RE INTEREST OF AUSTIN W. & LINDA W.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF AUSTIN W. AND LINDA W., CHILDREN UNDER 18 YEARS OF AGE.

JENNIFER S., APPELLEE,
V.
JACK W., APPELLANT.

Filed February 25, 2014.    No. A-13-540.

Appeal from the County Court for Stanton County: MICHAEL L. LONG, Judge. Affirmed.

Martin V. Klein and Ryan J. Stover, of Carney Law, P.C., for appellant.

Joel E. Carlson, of Stratton, DeLay, Doele, Carlson & Buettner, P.C., L.L.O., for appellee.

INBODY, Chief Judge, and PIRTLE and RIEDMANN, Judges.

INBODY, Chief Judge.

## INTRODUCTION

Jack W., the biological father of Austin W. and Linda W., appeals the decision of the Stanton County Court, sitting in its capacity as a juvenile court, terminating his parental rights. Jack contends that the county court erred in terminating his parental rights based upon its finding that he had abandoned his children and finding that termination was in the minor children's best interests. He also contends that although the termination action was brought by the minor children's mother, Jennifer S., without participation by the State, his parental rights should not have been terminated because reasonable efforts were not made to reunify him with his children.

## STATEMENT OF FACTS

Jack and Jennifer were married in May 1999. Two children were born of the marriage: Austin, born in July 1999, and Linda, born in April 2001. Jennifer and Jack were divorced in

December 2008, and custody of the parties' two minor children was granted to Jennifer. Jack was ordered to pay $50 per month in child support. After the dissolution decree was entered, Jack regularly exercised visitation with his children every other weekend and for 6 weeks during the summer.

In November 2010, Jack moved to Las Vegas, Nevada, and did not see his children from November 2010 until March 2012. Jack testified that he moved to Las Vegas because he "had nothing else here anymore" due to Jennifer's filing a protection order against him on November 18. Although Jack admitted that he was never served with this protection order, he claimed that he became aware a protection order had been filed against him when he attempted to exercise visitation with his children the weekend beginning November 22 and, during a telephone conversation, a police officer informed him that there was an active protection order against him. Jack admitted that he was familiar with the process of protection order cases and that, although he was never served with a copy of the protection order, he did not investigate whether the protection order had, in fact, been filed or whether the order would have allowed him to have contact with his children. A copy of the protection order, admitted as exhibit 13, established that although initially granted, the protection order was dismissed for lack of service. Further, the order specifically permitted contact with Jennifer for the purposes of discussing child visitation and did not prohibit contact with the minor children.

After moving to Las Vegas, Jack claimed that he attempted to maintain contact with his children through his uncle's "Facebook" account. However, according to Jack, 2 weeks after he moved, Jennifer learned that Jack had been using the uncle's "Facebook" account and blocked the uncle from her and the children's "Facebook" accounts. Jack made no other attempts to contact his children during the time that he resided in Las Vegas until he moved to Larchwood, Iowa, in 2012, at which point he had two visits with his children: a 2-hour supervised visit on March 31, 2012, and a 1½-hour therapeutic visit on January 4, 2013, supervised by Chad Wright. Jack did not see his children after the January 4 visit, despite his requests to have visits.

Jack claimed that he did not contact his children while he was in Las Vegas after Jennifer blocked his uncle's "Facebook" account because he thought that Jennifer had a protection order against him and he would have to contact his children through her. During the time that Jack was in Las Vegas, Jennifer did not receive any communications from Jack, his friends, or relatives regarding arranging visitation with the children, even though Jack had Jennifer's e-mail address which was known to Jack prior to his move to Las Vegas and remained the same. Further, Jack did not send the children any letters, cards, or presents during that timeframe.

On August 4, 2011, while Jack was still in Las Vegas, Jennifer filed a complaint to modify the dissolution decree requesting termination of Jack's parental rights on the basis of abandonment pursuant to Neb. Rev. Stat. § 43-292(1) (Cum. Supp. 2012) and alleging that termination was in the minor children's best interests. The matter was transferred to the county court acting as a juvenile court in accordance with Neb. Rev. Stat. § 42-364(5)(a) (Cum. Supp. 2012), which provides that whenever termination of parental rights is placed at issue, the court shall transfer jurisdiction to a juvenile court established pursuant to the Nebraska Juvenile Code unless a showing is made that the county court or district court is a more appropriate forum. The termination hearing was held on April 29 and May 3, 2013. Numerous witnesses testified at the

hearing. We have summarized pertinent evidence into the following areas: the children's symptoms and therapy, evidence relating to the children's best interests, and Jack's testimony.

*Children's Symptoms and Therapy.*

Wright, a licensed mental health practitioner, testified that Austin began therapy with another therapist in January 2010. At that time, Austin was diagnosed with "ADHD" and was determined to be a victim of physical abuse. Wright reported that history included on Austin's intake forms set forth that Austin had witnessed extensive physical abuse when Jack assaulted Jennifer numerous times; that Jack had hit Austin more than once, which Linda witnessed; that Austin had disclosed to a previous therapist that Jack was physically abusing him; and that after a weekend visit with Jack, Austin became moody and was having nightmares.

Wright began treating Austin and Linda in August 2010, when their previous therapist went on maternity leave. Wright provided therapy to both Austin and Linda until June 2011, at which time they had made sufficient progress that therapy was discontinued. Both Austin and Linda resumed treatment in April 2012.

When Wright began treating Austin and Linda in August 2010, both children were displaying mood changes and behavioral issues. Austin was still having nightmares, was demonstrating compulsive behaviors of checking windows and doors to make sure that they were closed and locked, was becoming more aggressive, and was having behavioral problems at home and at school, including being suspended from school a few times for fighting with other students and for taking a pocketknife to school to protect himself from Jack because he feared that Jack was going to come and take him from school and take off with him. According to Jennifer, during 2010, Austin would have nightmares nearly every night causing him to yell and scream in his sleep and punch the wall, as if he was fighting with someone. Linda was displaying behavioral issues, eating problems, and severe mood changes, including becoming withdrawn and isolating herself, yelling, throwing temper tantrums, and having crying spells. Wright diagnosed Linda with adjustment disorder with mixed disturbance of emotions and conduct.

From August to December 2010, Wright worked with Austin on coping skills, relaxation techniques, conflict resolution skills, and anger management techniques. During this same time period, Wright worked with Linda on helping her identify ways to communicate her frustrations and focusing on improving her self-esteem.

Between January and June 2011, both Austin and Linda showed improvement. According to Jennifer, by January 2011, Austin was still checking to make sure doors were locked before he went to bed, but he was not having nightmares, he was sleeping better, and he was not having issues with fighting at school. According to Jennifer, in 2011, Austin's grades and behaviors improved and he was calmer, polite, "a totally different kid." Linda was eating better, her communication was improving, her grades and behaviors had improved, and she was spending time with her friends again. By June, Austin and Linda had showed enough progress and were stable enough that they discontinued therapy. Austin's and Linda's improvements continued up until the March 31, 2012, supervised visit with Jack, after which time their symptoms returned. Due to the return of symptoms following the visitation with Jack, both Austin and Linda resumed therapy with Wright in April 2012. Linda began exhibiting behavior problems, sleeping problems, and eating problems; isolating herself from her friends; and exhibiting mood changes,

including crying spells and irritability. Austin began displaying mood changes, having behavior issues, having problems with sleeping, expressing fear, banging his head on things, crying, and being overly emotional. Austin also reported nightmares which he described as flashbacks of seeing Jack beating up Jennifer and Jack hitting him in the face with Jack's fist. Wright diagnosed Austin with adjustment disorder with disturbance of emotions and conduct. Wright worked with Austin on coping skills so that Austin could resume sleep after being awakened by the nightmares. Jennifer reported that it took 2 to 3 weeks after the visit with Jack before Austin's behaviors started to de-escalate and his aggression and nightmares subsided. Austin made progress, which Wright attributed to talking more with his mother, working through the fears he had, and using coping techniques. Jennifer reported that throughout the remainder of 2012, Austin did not have behavior outbursts, he was helpful at school, and he was getting good grades. Jennifer reported that from April to December 2012, Linda was back to normal and was spending time with friends.

Austin's and Linda's progress continued until the January 2013 therapeutic visit with Jack. Although Austin experienced nightmares, restless sleep, and other behaviors after the January 2013 therapeutic visit with Jack, he was able to function. Likewise, after the 2013 therapeutic visit with Jack, Linda was again having behavior problems, eating problems, and mood changes, including crying spells, irritability, and agitation. Linda was also isolating herself a little bit, but she was able to bounce back fairly quickly. Jennifer testified that in 2013, Linda has been a straight "A" student, she has a lot of friends, and she is involved in activities at school and in a church group. Wright testified that there were improvements in Austin's mental health during the extended periods of time when he did not see Jack. Wright further testified that in his professional opinion, if no changes were made in the way that the visits were to occur, he did not believe that it was in Austin's best interests for visits with Jack to continue and that Linda's symptoms will probably recur if visits resume with Jack. In fact, Jennifer reported that shortly before the termination hearing, both Austin and Linda were experiencing anxiety and Austin was having difficulty sleeping.

*Best Interests.*

At the time of the termination hearing, Austin was 13 years old attending junior high school in Norfolk, Nebraska, and Linda was 12 years old attending sixth grade at a Norfolk middle school. Austin and Linda both testified that during the years 2010, 2011, and 2012, they did not receive any cards, letters, or presents from Jack and that Jack did not contact them at all during the time that he lived in Nevada. Austin stated that in the past 3 years, Jack never told him that he loved him. Austin stated that he does not miss Jack, that he did not want to visit Jack again, and that he feels Jack did not care about him. Linda testified that she does not miss Jack, that she does not want to visit him, and that she does not think Jack loves her.

Jennifer, Austin, and Linda all testified regarding verbal and physical abuse by Jack. Jack would verbally abuse Jennifer and the children, calling Jennifer a "fucking bitch," "fat," "ugly," and "stupid"; calling Austin "stupid," "fucking retard," and "asshole"; and calling Linda "stupid" and "idiot" and telling her that she was "worthless" and that he was "not [her] dad." Additionally, Linda testified that Jack would get angry when Jennifer would use money to buy Austin and Linda clothes and school supplies, when he wanted the money to buy motorcycle

parts. Austin also testified that every day when Jennifer was at work and Austin and Linda were home alone with Jack, Jack would make them stay in their rooms because Jack was on the Internet looking up something that he was not supposed to look at. Austin also testified that during visits at Jack's house, Jack did not have much food available for them to eat, and that on one occasion when Austin asked for breakfast, Jack told him that he could not have breakfast and that he could pack up his things and leave.

Jennifer testified to approximately 10 incidents where Jack would grab the top of Linda's head and squeeze so hard that Linda would cry and that Jack would regularly smack Austin on the back of the head. Both Austin and Linda testified that Jack has a bad temper and that they witnessed Jack hit and choke Jennifer on multiple occasions. According to the children, Jack threw items at both them and Jennifer, such as pens, pencils, plates full of food, and cups. On one occasion, Jack threw a fork at Austin so hard that it went through Austin's pants and stuck in his leg. Another time, Jack broke Austin's dog's leg. Austin further testified that he was suspended for carrying a knife at school because he felt that he needed the knife to protect himself from Jack. Jack denied saying anything inappropriate to the children, hitting them, choking or hitting Jennifer in front of the children, throwing a fork at Austin, or harming Austin's dog. Linda also testified that she has scars on her fingers from a time when she was 3 years old and Jack failed to supervise her, because he was on the computer looking at pornography and she stuck her fingers in a blender.

Jack and Jennifer's neighbor testified that she observed Jack grab Austin by his throat, pick him up, and slam him on the ground in an angry manner while cussing at Austin. On another occasion, the neighbor observed Jack tell Austin to get him something out of the house and, when Austin refused, Jack punched Austin in the chest, knocking the air out of him. The neighbor stated that when Austin was able to catch his breath, he started screaming and crying and ran into the house. She testified that on at least 10 occasions, while she was sitting on her patio, she could hear Jack screaming at the children, even though they were inside their own home.

Jennifer testified that she remarried in January 2010 and that her current husband is a father figure to her children and is willing to adopt Austin and Linda. Although Jennifer's husband did not testify, Jennifer admitted that he had recently been convicted of providing false information to law enforcement which involved an incident where his coworker shot someone and he was driving the vehicle. Both Austin and Linda testified that they want Jennifer's husband to adopt them. According to Linda, Jennifer's husband buys her and Austin clothes and other necessities and provides food for them and puts their needs before his own; in contrast, Jack always put himself first, buying parts for his motorcycle before buying necessities for them.

*Jack's Testimony.*

At the time of the parties' divorce in December 2008, Jack was unemployed; however, within a few months, he found full-time work at Great Dane, earning over $9 per hour for a 40-hour week plus some overtime. After working at Great Dane for about 6 months, he worked for himself doing mechanic work for a period of time before working for John's Disposal. He then worked full time at Lindsey Manufacturing for about 7 months, earning $13 per hour. Jack's employment with Lindsey Manufacturing ceased when he was fired; at that point, he resumed

working for himself and thereafter moved to Las Vegas. During his time in Las Vegas, Jack was not employed from November 2010 until February 2011, at which time he worked part time installing car lifts, earning approximately $300 per month. He then worked for his uncle painting stripes in parking lots and held other part-time jobs. After returning from Las Vegas, Jack worked full time for D&L Masonry earning $12 per hour.

The evidence established that Jack's child support payments were sporadic. Jack made the following child support payments during the 6-month time period prior to the complaint to modify requesting termination of his parental rights: a $200 payment on March 14, 2011, and a $250.32 payment on July 28. Although Jack continued to make sporadic child support payments for the remainder of 2011 and 2012, he was nearly always in arrears. Jack testified that he continued to pay child support even though he understood that his parental rights might be terminated causing his child support obligation to cease, because he wants "to see his children."

Jack testified that he was convicted of delivery of a controlled substance in 1999 and was sentenced to 1 to 2 years' imprisonment. Then, in 2010, he was convicted of receiving stolen property and received probation and was ordered to pay restitution. He further admitted, upon cross-examination, that he pled guilty to third degree assault in 2001 and was sentenced to 6 months' probation and a $300 fine.

*Court's Order.*

On May 24, 2013, the Stanton County Court entered an order terminating Jack's parental rights to Austin and Linda. The court specifically found that Jack was physically and verbally abusive to the children, specifically Austin, during the marriage and after the divorce during visitations. The court further found that Jack had no contact with the minor children after mid-November 2010, except for two supervised visits that occurred on March 31, 2012, and January 4, 2013. The court specifically noted that Jack had no contact with the minor children from mid-November 2010 through the date of the filing of the complaint for modification on August 4, 2011, which was a period of over 9 months, and had sent no gifts or cards or otherwise communicated with the children since November 2010. Additionally, from mid-November 2010 to the time of the termination hearing, the court found that Jack had inconsistently paid the court-ordered $50 per month in child support by paying amounts ranging from $50 to $300 in order to pay arrearages that had accumulated after intervals of several months where he had not paid child support.

In making its determination that Jack abandoned his minor children, the court noted that Jack testified that he tried to contact the children by mail, telephone, and e-mail, and through relatives, but that Jennifer refused to allow the children to be contacted. The court noted that it had observed Jack's testimony and found said testimony "unbelievable" giving Jack's assertions "no weight or credibility" in the court's determination of whether he abandoned his minor children. The court further found that there was clear and convincing evidence that termination of Jack's parental rights was in the minor children's best interests because there was credible evidence that Jack was verbally and physically abusive to the children prior to November 2010, that 2½ years went by with the only contact Jack had with his children was two supervised visits held after the complaint to modify was filed, and that the children's mental health has improved significantly in Jack's absence.

ASSIGNMENTS OF ERROR

On appeal, Jack contends that the county court erred in finding that he had abandoned his children pursuant to § 43-292(1) and in finding that termination of his parental rights was in the minor children's best interests. He further contends that reasonable efforts were not made to reunify him with his children.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Angelica L. & Daniel L.*, 277 Neb. 984, 767 N.W.2d 74 (2009); *Wayne G. v. Jacqueline W.*, 21 Neb. App. 551, ___ N.W.2d ___ (2013). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Angelica L. & Daniel L., supra*; *Wayne G. v. Jacqueline W., supra*.

ANALYSIS

*Statutory Basis for Termination/Abandonment.*

Jack first contends that the county court erred in finding that he had abandoned his children pursuant to § 43-292(1). He contends that he did not abandon his children for the relevant 6 months immediately prior to Jennifer's filing of the complaint for modification, which requested termination of his parental rights, because he continued to pay child support and attempted to contact his children through "Facebook" during that 6-month time period.

Whenever termination of parental rights is placed in issue in the context of an action brought pursuant to chapter 42, the trial court relies upon § 43-292 of the Nebraska Juvenile Code in determining whether grounds for termination of parental rights exists. § 42-364(5). One of the grounds for termination of parental rights is abandonment. § 43-292(1). The crucial time period for purposes of determining whether a parent has intentionally abandoned a child for purposes of § 43-292(1) is determined by counting back 6 months from the date the petition was filed. *Kenneth C. v. Lacie H.*, 286 Neb. 799, 839 N.W.2d 305 (2013); *In re Interest of Dylan Z.*, 13 Neb. App. 586, 697 N.W.2d 707 (2005). See *In re Interest of Crystal C.*, 12 Neb. App. 458, 676 N.W.2d 378 (2004). Applied to the instant case, the crucial time period for the purpose of determining whether Jack had intentionally abandoned Austin and Linda is the 6 months prior to the August 4, 2011, filing of the petition for modification which sought termination of his parental rights, or the period of time between February 4 and August 4, 2011.

For purposes of § 43-292(1), abandonment has been described as a parent's intentionally withholding from a child, without just cause or excuse, the parent's presence, care, love, protection, maintenance, and opportunity for the display of parental affection for the child. *Kenneth C. v. Lacie H., supra*; *In re Interest of Dustin H. et al.*, 259 Neb. 166, 608 N.W.2d 580 (2000); *In re Interest of Dylan Z., supra*; *In re Interest of Crystal C., supra*; *In re Interest of Andrew M., Jr., & Marceleno M.*, 9 Neb. App. 947, 622 N.W.2d 697 (2001). "Whether a parent has abandoned a child within the meaning of § 43-292(1) is a question of fact and depends upon parental intent, which may be determined by circumstantial evidence." *Kenneth C. v. Lacie H.*, 286 Neb. at 807-08, 839 N.W.2d at 311. To sustain a finding of abandonment under § 43-292(1),

such a finding must be based on clear and convincing evidence that the parent has demonstrated an intention to withhold parental care and maintenance, not on the parent's failure to provide such care and maintenance as a result of impediments which are not attributable to the parent. *In re Interest of Dylan Z., supra*. See *In re Interest of B.J.M. et al.*, 1 Neb. App. 851, 510 N.W.2d 418 (1993) (abandonment not proved where failure to connect with children was due to systematically created series of impediments and not to indifference). Clear and convincing evidence is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of the fact to be proved. *Kenneth C. v. Lacie H., supra*.

Jack admits his efforts at maintaining contact with his children from November 2010 until March 2012 were minimal. He testified that he attempted to contact Austin and Linda through his uncle's "Facebook" account for about 2 weeks after moving to Las Vegas, but then he claimed that Jennifer discovered he was using the "Facebook" account and blocked his uncle from her account and the children's accounts. Jack admits that after the initial 2 weeks that he was in Las Vegas, he did not contact the children but claimed that he did not make additional attempts to contact his children for 1 year because he believed that Jennifer had a protection order filed against him. In fact, more than 9 months passed between Jack's last visit with the children in mid-November 2009 and the filing of the complaint to modify which requested termination of Jack's parental rights. Further, from December 2009 until March 2012, the children did not receive any telephone calls, letters, cards, or presents from Jack.

Jack also points to his child support payments as evidence that he did not abandon Austin and Linda. Although the record reflects that Jack did pay child support during the 6-month time period prior to the filing of the complaint for modification requesting termination of his parental rights, Jack paid support inconsistently, making two payments during this time period, one on March 14, 2011, and one on July 28, 2011. Although the $450.32 total amount paid by Jack during this time period exceeded the $50 monthly child support ordered, Jack's excess payments merely served to repay arrearages that had accrued due to his inconsistent and untimely child support payments. We further note that the Department of Health and Human Services payment history report, received into evidence as exhibit 10, reveals that Jack's inconsistent and untimely payment history continued from 2011 up until the time of the termination hearing in 2013. Even the consistent payment of child support, by itself, is insufficient to prevent a finding of abandonment, *In re Interest of A.W.*, 820 N.W.2d 128 (N.D. 2012), and, in this case, Jack's child support payments have been both untimely and inconsistent.

Even though Jack points out that he did have two visits with his children after the complaint for modification requesting termination of his parental rights was filed, abandonment is not an ambulatory thing the legal effects of which a parent may dissipate at will by token efforts at reclaiming a discarded child. *Kenneth C. v. Lacie H.*, 286 Neb. 799, 839 N.W.2d 305 (2013). "The parental obligation is a positive duty which encompasses more than a financial obligation." *In re Interest of Theodore W.*, 4 Neb. App. 428, 440, 545 N.W.2d 119, 128 (1996). Parental obligation requires a continuing interest in the child and a genuine effort to maintain communication and association with that child. *Id*. In sum, Jack's complete lack of contact with his children from mid-November 2010 until March 2012 coupled with his inconsistent and untimely efforts to meet his minimal child support obligation constitutes clear and convincing evidence of abandonment.

*Best Interests.*

Even after determining that grounds existed for terminating Jack's parental rights on the grounds of abandonment, the district court could not terminate Jack's parental rights unless such action was "in the best interests of the minor child, as defined in the Parenting Act." § 42-364(5)(a); *Kenneth C. v. Lacie H., supra.*

> The Parenting Act defines "[b]est interests of the child" as "the determination made taking into account the requirements stated in section 43-2923." [§ 43-2922(3).] Section 43-2923 addresses the best interests of a child in the context of parenting, visitation, and custody arrangements within an intact parental relationship. It includes a list of five nonexclusive factors which a court is to consider in making this determination.

*Kenneth C. v. Lacie H.*, 286 Neb. at 808, 839 N.W.2d at 312-13.

The first factor is "[t]he relationship of the minor child to each parent prior to the commencement of the action . . . ." Neb. Rev. Stat. § 43-2923(6)(a) (Cum. Supp. 2012). As previously set forth, Jack had no contact with the children for more than 9 months prior to the filing of the complaint for modification seeking termination of Jack's parental rights. In fact, by his own admission, Jack had no contact with Austin and Linda from December 2010 until March 2012. The evidence further established that prior to the commencement of the action, Jack had a strained relationship with Austin and Linda due to the physical and verbal abuse that they witnessed and experienced.

The second factor is "[t]he desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning." § 43-2923(6)(b). Both Austin and Linda testified, and at the ages of 13 years old and 12 years old, respectively, they are of an age of comprehension. Both testified as to the physical and verbal abuse that they witnessed and endured. Both testified that they do not miss Jack and do not want to see him.

The third factor is "[t]he general health, welfare, and social behavior of the minor child." § 43-2923(6)(c). As previously mentioned, the record established that Austin and Linda were exposed to physical and verbal abuse by Jack. Both have been treated by a therapist. Both Austin's and Linda's symptoms and behaviors worsened when they had visitations with Jack; during the period of time when Jack was absent from their lives, their symptoms and behaviors improved.

The fourth and fifth factors are "[c]redible evidence of abuse inflicted on any family or household member" and "[c]redible evidence of child abuse or neglect or domestic intimate partner abuse." § 43-2923(6)(d) and (e). The evidence established that Jack physically abused Jennifer, Austin, and Linda. The children testified witnessing Jack hit and choke Jennifer on multiple occasions. A neighbor testified seeing Jack grab Austin by the throat, pick him up, and slam him to the ground and, on another occasion, seeing Jack punch Austin in the chest so hard it knocked Austin's breath away and, once Austin could catch his breath, he ran into the house crying. We need not recount all the instances of abuse set forth in the record. Suffice it to say that Jack's conduct would constitute both domestic intimate partner abuse and abuse inflicted on a household member under the definitional provisions of the Parenting Act. See Neb. Rev. Stat.

§ 43-2922(8) and (10) (Cum. Supp. 2012). See, also, Neb. Rev. Stat. § 42-903 (Cum. Supp. 2012) (incorporated by reference in §§ 43-2922(8) and 43-2923(6)(d)).

Thus, consideration of each of the foregoing statutory factors leans in favor of termination of Jack's parental rights. However, because parental unfitness must also be shown before parental rights may be terminated, we proceed to consider whether parental unfitness has been shown in the instant case.

It is well established that a juvenile's best interests are a primary consideration in determining whether parental rights should be terminated as authorized by the Nebraska Juvenile Code. *Kenneth C. v. Lacie H.*, 286 Neb. 799, 839 N.W.2d 305 (2013). Just as in cases where the State seeks to terminate parental rights, when one parent asks a court to terminate the other parent's rights with respect to their child, parental rights constitute a liberty interest and a parent's interest in the accuracy and justice of the decision to terminate his or her parental rights is a commanding one. See *id.* Thus, until parental unfitness has been proved, the parent and child share a vital interest in preventing erroneous termination of their natural relationship. *Id.*

The evidence adduced established that Austin and Linda have been exposed to physical and verbal abuse by Jack that has resulted in symptoms ranging from nightmares, compulsive checking of doors and windows, eating problems, behavior issues, aggression, irritability, and mood changes. These symptoms would improve or disappear when Jack was absent from the children's lives, then reappear when Jack would resurface in the children's lives. Jack's unfitness to parent Austin and Linda is evident by the negative impact that he has had on their lives.

In sum, all of the facts taken together clearly and convincingly established that Jack is not a fit parent for Austin and Linda and that termination of Jack's parental rights is in Austin's and Linda's best interests.

*Reasonable Efforts.*

Jack also contends that the county court erred in terminating his parental rights when reasonable efforts were not made to reunify him with his children. Reasonable efforts to reunify a family are required under the juvenile code only when termination is sought under § 43-292(6). *In re Interest of Hope L.*, 278 Neb. 869, 775 N.W.2d 384 (2009); *In re Interest of DeWayne G. & Devon G.*, 263 Neb. 43, 638 N.W.2d 510 (2002). In this case, termination was not sought under § 43-292(6); it was sought solely under § 43-292(1). Thus, reasonable efforts were not required in this case.

## CONCLUSION

Upon our de novo review of the record, we find that the evidence clearly and convincingly established that termination of Jack's parental rights was warranted pursuant to § 43-292(1) and that termination was in Austin's and Linda's best interests.

AFFIRMED.