IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF AFINITI R.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF AFINITI R., A CHILD UNDER 18 YEARS OF AGE.

JODI R., APPELLEE AND CROSS-APPELLANT,

V.

SHANE R., APPELLANT AND CROSS-APPELLEE.

Filed March 7, 2023.    No. A-22-453.

Appeal from the County Court for Lincoln County: JOEL B. JAY, Judge. Affirmed.

Chevas Shaw, of Shaw Law, L.L.C., for appellant.

Michele J. Romero and Vikki S. Stamm, of Stamm, Romero & Associates, P.C., L.L.O., for appellee.

MOORE, BISHOP, and WELCH, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Shane R. and Jodi R. were divorced in May 2018. Jodi subsequently sought to modify Shane's parenting time with their daughter, Afiniti R., and in September 2021, she sought to terminate Shane's parental rights to Afiniti. The Lincoln County District Court transferred the case to the county court for Lincoln County, sitting as a juvenile court. Shane appeals from the juvenile court's order terminating his parental rights to Afiniti. Jodi R. cross-appeals the juvenile court's decision to appoint an attorney for Shane. We affirm.

- 1 -

## II. BACKGROUND

### 1. PROCEDURAL BACKGROUND

Jodi and Shane are the parents of Afiniti, born in 2016. Afiniti was 5 years old at the time of the parental rights termination hearing.

Shane is also the biological father of three other children, Sierra R., Natalya R., and O'Shea R. Jodi is not the mother of those three children. We note that Natalya and O'Shea were removed from Shane's care and were subject to separate juvenile cases wherein his parental rights were ultimately terminated, although that termination occurred after the termination of Shane's parental rights to Afiniti in the current case. Our opinion affirming the termination of Shane's parental rights to Natalya and O'Shea was released the same day as our opinion in the current case. See *In re Interest of Natalya R. & O'Shea R.*, Nos. A-22-451 and A-22-452 (Neb. App. Mar. 7, 2023) (selected for posting to court website).

#### (a) Divorce Decree and Previous Modification

According to exhibits received into evidence in the current case, the Lincoln County District Court dissolved the marriage of Jodi and Shane by a decree entered in May 2018. The decree does not appear in our record, however subsequent orders by the district court that do appear in our record give a procedural history upon which we rely. Pursuant to the decree, Jodi was awarded custody of Afiniti, subject to Shane's parenting time. Shane was awarded parenting time every other weekend on Saturday from 9 a.m. to 6 p.m. and Sunday from 9 a.m. to 6 p.m., and every Wednesday from 5 to 8 p.m. Shane was also awarded parenting time during named holidays and an extended time including overnights during the summer months. Shane was ordered to pay $452 per month in child support for Afiniti.

According to exhibits received into evidence, in December 2018, Jodi filed a motion for an ex parte temporary supervised visitation order. She alleged that Shane had his two minor children removed from his custody and placed with the Nebraska Department of Health and Human Services (DHHS). Jodi further alleged that Shane had been neglecting Afiniti and asserted that there was an investigation against Shane for potentially assaulting Afiniti. The district court declined to issue an ex parte order and no further action to prosecute the issues raised by Jodi was taken at that time.

Between August 2018 to November 2020, Jodi and Shane filed various contempt actions against each other. Jodi alleged that Shane was in contempt for (1) failing to pay child support in the amount directed by the decree and (2) failing to promptly return Afiniti following his scheduled parenting time. Shane alleged that Jodi was in contempt for failing and refusing to allow him parenting time with Afiniti as ordered by the court.

In April 2020, Jodi filed a complaint for modification in which she requested that Shane's parenting time with Afiniti be either permanently suspended, reduced, or modified, and that all contact be supervised. The district court subsequently appointed Brennon Malcom as the guardian ad litem (GAL) for Afiniti, after Jodi and Shane waived any objections.

Following a trial, the district court ruled on the contempt actions and modified the decree in its journal entry and order dated November 30, 2020, which was further altered and amended in a journal entry and order dated February 18, 2021. The court found Shane in contempt for failing

to pay his court-ordered child support obligation and for failing to return Afiniti at the end of his scheduled parenting time. The court also found Jodi in contempt of the court-approved parenting plan, particularly after Shane became a person of interest in a December 2018 sexual assault investigation regarding Afiniti and even after the investigation had closed with no subsequent action recommended. The court stated,

> Throughout the past two years, Shane's request for parenting time with Afiniti has not been consistently pursued but pursued nevertheless. It is readily apparent that Shane's initial pleas and requests for parenting time were either ignored or purposefully "tabled" with no follow-up response from Jodi. After the conclusion of the police investigation, Shane's parenting time as set out in the Decree was never modified or suspended by the Court. Yet, Shane's constitutionally protected and court-ordered parenting time with Afiniti was manipulated and withheld without Court approval.

In discussing a modification of Shane's parenting time, the district court found that, "In all of the myriad of accusations presented to the Court, one inescapable fact remains: Shane has not had contact with his daughter for a substantial period." "Afiniti is now four (4) years old. . . . For whatever reason, Afiniti has not seen her father for, what turns out to be, one-half of her life." The court noted that Afiniti's therapists and the GAL perceived that Afiniti had "extreme anxiety, insecurity, and perhaps fear of seeing her father." The court found that the lack of contact between Afiniti and her father was a material change in circumstances justifying a modification of the parenting plan, and that a modification was "vitally necessary to provide a basis upon which Shane's relationship with Afiniti can be restored and stabilized." The court "integrate[d] the recommendations of the therapists and the GAL into a reasonable parenting time award" that would be in Afiniti's best interests.

Accordingly, the district court ordered that Shane obtain a parenting assessment "prior to the commencement of any therapeutic parenting time." Once the parenting assessment was complete, Shane would have therapeutic parenting time with Afiniti while he "contemporaneously" participated in individual counseling. The court specified parameters for the therapeutic parenting time which, once completed, would allow Shane to progress to increasing amounts of daytime parenting time. Ultimately Shane's parenting time would return to what it was in the May 2018 decree, with some specified amendments.

### (b) Current Complaint for Modification and Termination of Parental Rights

On September 1, 2021, Jodi filed a "Complaint for Modification (Termination of Parental Rights)" in the district court, alleging that there had been a substantial and material change in circumstances warranting modification of the decree and termination of Shane's parental rights. She alleged that Shane's parental rights to Afiniti should be terminated pursuant to Neb. Rev. Stat. § 43-292(1), (2), (3), (4), and/or (9) (Reissue 2016). Specifically, she alleged as follows. Shane abandoned Afiniti for 6 months or more immediately prior to the filing of the complaint. He substantially and continuously or repeatedly neglected and refused to give Afiniti or a sibling of Afiniti the necessary parental care and protection. He willfully neglected to provide Afiniti with necessary subsistence, education, or other care necessary for her health, morals, or welfare or had

neglected to pay for such subsistence as ordered by the court (i.e. he failed to pay his child support obligation of $452 per month and as of August 30, 2021, was $11,600.32 in arrears, with his last payment being collected on January 22, 2021). Shane was unfit by reason of habitual use of narcotic drugs, which conduct was seriously detrimental to the health, morals, or well-being of Afiniti and other siblings and children in his care (noting the ongoing juvenile cases regarding his other children, Natalya and O'Shea). Shane subjected Afiniti or another minor child to aggravated circumstances, including, but not limited to abandonment, torture, chronic abuse or sexual abuse (noting the ongoing juvenile cases regarding Natalya and O'Shea). Shane had numerous criminal convictions including violent and assaultive behavior. He had been unable to make any progress towards his therapeutic visitations with Afiniti. And he had been evicted from various residences, had multiple employers, and could not maintain proper housing or employment. Jodi further alleged that terminating Shane's parental rights would be in Afiniti's best interests. Alternatively, Jodi requested a complete suspension of Shane's parenting time. She also requested an equitable award of attorney fees and costs.

Jodi sought to have the matter heard in the district court and not have it transferred to juvenile court. Her motion to have jurisdiction accepted by the district court was filed on September 2, 2021. However, on October 5 the district court entered a journal entry and order transferring the matter to the juvenile court after finding that it was a more appropriate forum for the termination of parental rights proceeding. See Neb. Rev. Stat. § 42-364(5) (Cum. Supp. 2020) (whenever termination of parental rights is placed in issue the court shall transfer jurisdiction to juvenile court unless showing is made that county court or district court is more appropriate forum).

On January 13, 2022, the juvenile court overruled Jodi's objection to the appointment of counsel for Shane.

## 2. TERMINATION HEARING

The hearing on Jodi's complaint was held by the juvenile court on January 20, 2022. Shane did not appear at the hearing but was represented by counsel who did appear. Shane's counsel stated, "My client was arrested just a few minutes ago [on a warrant] and is apparently refusing to be brought over," "[s]o I guess we'll proceed without him present."

### (a) Jodi's Testimony

Jodi testified she is the mother of Afiniti, who was currently 5 years old. Jodi's and Shane's divorce was finalized in May 2018 and Jodi was granted sole legal and physical custody of Afiniti. Shane's parenting time was limited to daytime parenting time every other weekend and every Wednesday evening. However, he was awarded extra time during the summer, including overnights. Jodi stated that by summer 2018, Shane was keeping Afiniti longer than he was supposed to under the decree. Afiniti started having "extreme night terrors" and would scream out "'Stop. Don't touch me.'" Afiniti also started "talking about . . . sexual things" that she should not have known about and was touching herself and other people on private areas. She would hit and get really angry at times, and she would withdraw at times. Afiniti would "cry all of the time" and did not want to go for Shane's parenting time. Jodi tried to get Afiniti into counseling because of

- 4 -

the nightmares, but she was put on a wait list. Jodi also took Afiniti to several different doctor visits because she came home from Shane's parenting time with "irritation in her private areas."

Jodi testified that Afiniti's behaviors worsened by December 2018. Jodi stated that Shane kept Afiniti "for the entire weekend against the [court] order" and when he returned her on December 3 "[h]er genital area was messed up" and Jodi "called the cops." Afiniti was examined at a child advocacy center, but they were unable to interview Afiniti because of her age. At that time, Officer McNeil was assigned to the case and Jodi stayed in contact with him and let him know when Afiniti made disclosures. At some point, Afiniti said that "dad" and an "Uncle John" "hurt her there." Jodi was not aware of an uncle named John and "no one ever could seem to find out who Uncle John was." According to Jodi, Officer McNeil said that he was suspending Shane's visits due to the investigation. The investigation was later suspended, and the suspension of Shane's parenting time was lifted.

Jodi took Afiniti to counseling with Stephanie Morse and "as soon as [Afiniti] was with Stephanie and she was doing her intake or whatever . . . that's when [Afiniti] told Stephanie specifically that he poked her in the bunnies and the biscuits . . . that's what she calls it." Jodi contacted her attorney to initiate the current case. Jodi said she never heard from Shane again and "[h]e was just kind of nowhere to be found." Jodi also learned that Shane had an ongoing juvenile case for his other children when DHHS sent her a letter in February 2019; the letter, received into evidence as exhibit 15, notified Jodi that Shane's three older children were placed in the temporary custody of DHHS and asked if she would consider providing a home for them or if she was aware of other relatives who might wish to be involved.

Jodi testified that Afiniti has not had any contact with Shane since December 2018, other than a brief encounter at a playground in May 2019; Afiniti "jumped" into Jodi's arms and did not want to touch Shane when he tried to hold her hand. Jodi stated that Shane did not make attempts at in-person or phone contact with Afiniti. He did not send birthday cards or Christmas gifts to Afiniti, nor did he regularly pay child support since 2018. The DHHS child support payment history was received into evidence and shows that as of January 18, 2022, Shane had an outstanding balance of $14,039.71, and his last payment of any kind was $45.15 on January 22, 2021. Jodi stated that pursuant to a court order Shane had to do a parenting assessment and individual counseling, followed by therapeutic visits. To Jodi's knowledge, Shane never did a parenting assessment or individual counseling. Jodi filed to terminate Shane's parental rights on September 1, 2021.

According to Jodi, Afiniti remembers Shane, "[b]ut everything she remembers is the bad things." Jodi does not initiate talk of Shane with Afiniti; "the counselor said . . . don't ever talk to her about it, don't question her about it," but the counselor told her how to handle it if Afiniti brought it up. So, "[u]nless it was initiated by [Afiniti] in any way, we don't ever speak of him at all." When asked if Afiniti's night terrors and sexual behaviors had pretty much ceased at this point, Jodi replied, "[Y]es, they have," she has "been doing really well." When asked on cross-examination if Afiniti ever asked about Shane or expressed a desire to know him, Jodi responded, "No."

(b) Stephanie Morse's Testimony

Stephanie Morse, a licensed independent mental health practitioner, testified that she began working with Afiniti on December 10, 2018, because there had been "some possible inappropriate touching." Afiniti had been to a child advocacy center after which Jodi was referred to Morse. Shane was not having visitation at the time because it had been suspended due to an investigation. According to an exhibit received into evidence, during the initial assessment, Afiniti disclosed to Morse that Shane "pokes me and I do not like it"; when asked how she was poked Afiniti reported it was in her "bunnies" (she pointed to her vaginal area) and her "biscuit" (she pointed to her buttocks), and she said it happened at Shane's house in his bed. Morse testified that during the initial diagnostic interview, she diagnosed Afiniti with adjustment disorder specifically to trauma stressors. Morse and Afiniti had 22 sessions, with the last session occurring on September 18, 2019, because Afiniti and her mother moved. Morse had no contact with Shane during the time frame that she worked with Afiniti.

Afiniti turned 3 years old during the time period Morse provided her and Jodi child-parent psychotherapy. Morse did not note any concerns about Jodi's ability to parent Afiniti. Morse testified that during therapy, Afiniti disclosed that Shane "was poking her in her vaginal and anal areas" and touching her breast area. Afiniti also demonstrated "adult sexual acts" through dolls and acted out in a sexual manner. Additionally, Afiniti was "hypervigilant" if she thought "anyone would attempt to touch her in her private areas, like through hygiene, bathing, nightmares." Morse made a report to the DHHS hotline in January 2019, but the report was not followed up on because "all the reports were already made prior to [Afiniti] coming to [Morse], so then [Morse] made additional ones." Morse stated that she then spoke with Officer McNeil about what Afiniti was disclosing, "[a]nd then it ended up them [sic] telling me that the investigation was . . . stopped because of lack of evidence." Morse also stated that Officer McNeil said that Shane's visits were no longer suspended.

Subsequently, on January 15, 2019, Morse wrote a document, received into evidence as exhibit 14, to have Shane's visitation suspended or at least supervised. Morse's 3-page document did not include a salutation but in the first paragraph, Morse stated, "This affidavit is being written on behalf of Afiniti"; the document was notarized. Morse recounted Afiniti's disclosures in therapy about being touched inappropriately by Shane, disclosures Afiniti made to Jodi, and concerning sexualized behaviors exhibited by Afiniti. Morse was concerned about Afiniti's safety with Shane and recommended that his visits be suspended or at least supervised "[i]f the court feels that visitations are not able to be suspended at this time."

Morse testified that during their time working together, Afiniti also had contact with "Stephanie," who lived with Shane. Afiniti commented that Stephanie was not nice to her and "[t]here was some kicking, some hitting," and Afiniti had seen Shane and Stephanie engaging in sexual activity. Based on her involvement with Afiniti from December 2018 to September 2019, Morse did not believe it was in Afiniti's best interests to have contact with Shane.

(c) Jody Angel-Trejo's Testimony

Jody Angel-Trejo, a licensed independent mental health practitioner, testified that she did an intake assessment of Afiniti in October 2019, and diagnosed her with specified trauma and stressor-related disorder. Angel-Trejo stated that Afiniti had already had a reduction in some of

the reported symptoms as a result of her therapy with Morse, but there were still symptoms consistent with "very sexualized play," emotional dysregulation, and disrupted sleep patterns.

Although Angel-Trejo completed the intake assessment, Jeslynn Love was Afiniti's treating clinician until August 2020, at which time Love went on maternity leave and the case was transferred to Angel-Trejo; however, as the clinical director, Angel-Trejo provided clinical supervision for this case. Once the case was transferred to Angel-Trejo in August, she worked with Afiniti and Jodi every other week" for a limited amount of time." Jodi was "very humble about her parenting style," "very open to feedback," and "[v]ery open to learning a little bit more about the therapeutic role" of a parent and mitigating Afiniti's early stressors. When Angel-Trejo saw progress and Jodi's "attunement" to Afiniti, sessions were reduced to once a month. Angel-Trejo said they "maintained monthly [sessions] with the intent of potentially having some work with Shane," "[h]owever, because . . . there was no follow-through on that, we ultimately ended up recommending that we discontinue services."

Angel-Trejo had approximately 20 sessions with Afiniti and Jodi and Jodi never disparaged Shane or spoke poorly of him. Afiniti did not disclose any sexual or physical abuse by Shane to Angel-Trejo, but Angel-Trejo considered that "irrelevant" because she focused on the child's behaviors. Angel-Trejo explained that

> when we have a child playing these games that she was playing that were very sexualized in nature, that's a clear indication -- to me, much clearer than what a child will report because they get very disorganized anyway at that age -- very clear indication that there's been some type of inappropriate sexual patterns or exposure for this child.

Angel-Trejo and Love had a telehealth session with Shane on July 17, 2020, to let him know that the case was transitioning to Angel-Trejo, and to discuss the allegations of sexual abuse and make him aware of the treatment goals. Angel-Trejo stated that Shane denied that he had engaged in any type of inappropriate behaviors with Afiniti (on cross-examination, Angel-Trejo said that Shane believed that "Jodi was saying these things and, you know, really kind of . . . implying these things to her child and that he had never done anything.") At that point, Angel-Trejo recommended a parent evaluation with a psychologist followed by family sessions as recommended. Angel-Trejo stated that Shane was agreeable to that at the time because he wanted to have contact with Afiniti. However, to Angel-Trejo's knowledge, Shane did not complete a parenting evaluation and Shane never contacted her again after their telehealth session.

Angel-Trejo discharged Afiniti on December 10, 2020, because "she no longer warranted medical necessity." Afiniti was no longer exhibiting sexualized play--"those symptoms really had subsided and she was functioning quite typically." When asked if Shane not having any physical contact with Afiniti for 3 or 4 years would have something to do with how she was doing in counseling, Angel-Trejo responded, "It certainly could" "[b]ecause, typically, if a child has exposure to someone who's been unsafe or has been connected to patterns of fear or dysregulation, that's going to activate a child's system" and "typically, we see a re-emergence of symptoms." However, on cross-examination Angel-Trejo confirmed that she could not say with any specificity that the abatement of Afiniti's symptoms were the direct result of having no contact with Shane.

Angel-Trejo wrote a recommendation letter dated February 1, 2021. The letter, received into evidence as exhibit 12, was addressed to "Whom It May Concern," and stated that she received

"the order" from Jodi's counsel in November 2020 and was made aware that she was to provide family therapy for Afiniti and Shane; that since receiving the order Shane had not reached out via email or telephone; that currently Afiniti was doing well and was no longer attending therapy as it was not "medically necessary." (It was not until the district court's order of February 18, 2021, that Shane was ordered to complete a parenting assessment prior to the commencement of any therapeutic parenting time with Afiniti.)

Angel-Trejo was made aware "in the recent week" that Shane's older children were removed from his care and it "[a]bsolutely" caused her concern for Afiniti's safety. Any assaultive behavior towards women or child abuse/neglect by Shane would cause Angel-Trejo concern. Angel-Trejo testified that any time there is a parent of a minor child who has had any type of physical aggression towards another individual, her recommendation is a parenting assessment and follow-through with individual counseling, and she would never recommend there be any contact without those things having occurred successfully.

Angel-Trejo was asked if she would recommend that terminating Shane's parental rights was in Afiniti's best interests. Angel-Trejo responded,

> You now, I'm very reticent, too, as well, to make those direct determinations [because I don't ever think that's my role, it's up to the courts to make those determinations]. What I would say to the Courts is when we think about what matters in a person's lifetime, birth to 8 years is the most important time. And if we have care providers who can't display consistent, attuned, nurturing, safe interactions, it creates a lifetime of -- of struggles with -- with risk factors for major mental illness. So if it's been demonstrated that Shane cannot provide that with his child or children, I would recommend termination.

Angel-Trejo was then asked if the risk to a child's mental health increases the longer we wait. She responded,

> It depends on what the child is aware of. If a child is not made aware of a lot of these court proceedings and what's happening and just is continuing with her life in the manner that she's safe and she's -- has a safe caretaker, I'm not sure that I would say that it would make a lot of difference. Um, however, if there are the risk factors of her seeing her parent and him not being at a place that's been rehabilitated or safe, yeah, that would be very concerning.

When asked if she was aware that Shane's most recent removal of his older children was based upon methamphetamine exposure, Angel-Trejo replied, "No, I was not aware of that," and it would "[a]bsolutely" add to her concerns about Shane, as would his refusal to wear a court-ordered drug patch. She was again asked if it would be in Afiniti's best interests to terminate Shane's parental rights. This time Angel-Trejo replied, "Based on the information provided in front of me and my experience," it would not be in Afiniti's best interests "[t]o continue to have contact with [Shane]," "[s]o termination of parental rights would be likely in [Afiniti's] best interest." On cross-examination, Angel-Trejo confirmed that ultimately, she believed that it was in Afiniti's best interests to terminate Shane's parental rights.

Angel-Trejo was asked how terminating Shane's parental rights would be practically different for Afiniti given that Shane had not had meaningful contact with her for several years. Angel-Trejo responded, "Well, my concern would be . . . contact of any sort." She continued, "[m]y biggest concern would be if Shane were dysregulated in any shape or fashion -- which it sounds to me that he's had a history of [sic] with her -- would be unhealthy"; "so . . . if there are risk factors for this parent coming back into contact and not having any progress in his functioning, that would concern me significantly, which typically there is if there's not a termination process that occurs." When asked if it is conceivable that there could be positive contact between Afiniti and Shane in the future, Angel-Trejo replied, "[P]arents always can . . . get better," "[d]o better," so "there's always a possibility," "[b]ut it's a commitment," and "it's not just a few family sessions and we're done," "it's following through with all of these things that haven't occurred." Angel-Trejo stated that, in her observation, Shane "certainly hasn't moved in the right direction." If Shane came back into contact with Afiniti with his behaviors present, it could cause Afiniti to regress. Angel-Trejo stated, "[E]ven when we have children removed from their parental figures and after six months to a year, they start visits again, even in a [sic] very controlled supervised visits, we see all kinds of behaviors to include dysregulation, outbursts, bedwetting, encopresis, . . . peer relational issues," and "[s]truggles academically." When asked if there were differences that she could see and some great benefits to a termination of rights versus just a suspension of time, Angel-Trejo replied, "Yes."

(d) Margaret Jackson's Testimony

Margaret Jackson is a licensed attorney and was Afiniti's GAL in the current juvenile court case. Jackson was previously the GAL for Shane's oldest daughter, Sierra. Jackson has also been the GAL for Shane's other two children, Natalya and O'Shea, in their separate juvenile cases since June 2019.

*(i) 2018 Juvenile Cases for Shane's Other Children*

According to Jackson, Natalya and O'Shea were removed from Shane in December 2018 because there were several allegations that they were missing school and coming to school not clean or cared for, and O'Shea had behavior issues in school and was falling asleep in class; two juvenile cases (the 2018 juvenile cases), one for each child, were filed alleging that the children were within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). According to transcripts from those 2018 juvenile cases (received into evidence in Afiniti's case), drug patch testing was a condition of visitation. The children were adjudicated to be within the meaning of § 43-247(3)(a) based on their mother's admissions.

In the 2018 juvenile cases, Jackson filed motions to terminate Shane's parental rights to Natalya and O'Shea on May 28, 2020. In her motions, Jackson alleged abandonment of the children for 6 months or more; substantial and continuous or repeated neglect of the children; parental unfitness because of debauchery, habitual use of intoxicating liquor or narcotic drugs, or repeated lewd and lascivious behavior, which conduct was seriously detrimental to the health, morals, or well-being of the children; failure to correct the conditions leading to adjudication; and the children were out of the home for 15 or more months of the most recent 22 months. Jackson stated that at the date of filing her motion, Shane had not participated in drug patch testing nor had

any sanctioned visitation with the children (he did have some visits with the children outside of DHHS' knowledge).

Jackson testified that Shane began visitation with Natalya and O'Shea in July 2020 after he had two negative drug patches. Jackson believed he was on probation for another case at the time of the negative patches. Shane was unemployed for a period of time but got a job in the summer of 2020. Jackson and the county attorney ultimately decided to dismiss the 2018 juvenile cases "based on the fact that [Shane] was having visits with the children from the foster parent and that the Department was unwilling to move placement of the children in order to verify that he would not have that outside contact until he . . . could show that he was sober and stable." Jackson stated, "we came to the conclusion that we would dismiss the case but keep an eye on the family." The motion to dismiss the two 2018 juvenile cases was filed in October 2020. When asked about the decision to dismiss the 2018 cases, Jackson clarified that the children had not been adjudicated as to Shane on the 2018 allegations because their mother had already "done a no contest," and "the issue was that [Shane] was never ordered to comply with anything, technically." The dismissal occurred at the end of October 2020.

### (ii) 2021 Juvenile Cases for Shane's Other Children

According to Jackson, 3 months later, Natalya and O'Shea were once again removed from Shane due to allegations that he was using methamphetamines and two new juvenile cases were filed on February 12, 2021 (the 2021 juvenile cases). Jackson stated that Natalya and O'Shea made disclosures of Shane's methamphetamine use, and of not being fed on several occasions and having to go to neighbors or their older sister in order to get food. According to transcripts from those 2021 juvenile cases (received into evidence in Afiniti's case), Shane was ordered to submit to drug patch testing as a condition of visitation. The juvenile court adjudicated Natalya and O'Shea after a contested adjudication hearing in June. Jackson testified that Shane's supervised in-person visits with the children were suspended in July because his drug patches continued to test positive for methamphetamines and it appeared that his drug use was affecting his visitation because he was having issues staying awake. Video visits continued to occur, at first without DHHS' knowledge and later with its permission. Jackson stated that Natalya was currently 16 years old and O'Shea was currently 12 years old and she continued to recommend that they be placed out of Shane's home. She said that "[t]he Department is doing the termination packet" and it will be forthcoming. Jackson's current recommendation was that it was in the best interests of Natalya and O'Shea to terminate Shane's parental rights.

### (iii) Afiniti's Case

Jackson's GAL report to the juvenile court in Afiniti's case was dated January 13, 2022, and was received into evidence. In her report, Jackson stated that she was appointed Afiniti's GAL on October 8, 2021. To Jackson's knowledge, Shane never completed a parenting assessment and therefore had not started on the progressive parenting plan outlined in the district court's November 2020 and February 2021 modifications to the divorce decree. Jackson reviewed the "file from the divorce" and the 2020 GAL report provided by Afiniti's GAL (Malcom) in the district court proceedings.

Malcom's GAL report, dated August 14, 2020, was received into evidence as exhibit 16. Malcom stated that he had spoken to and met with Jodi, Shane, and Afiniti, and had spoken to various other individuals, including Jackson and Afiniti's therapists (Morse and Love). Malcom recommended

> that the Court consider following the recommendations of both Afiniti's current counselors (Ms. Love and Ms. Trejo) and the independent mental health professional consulted by the undersigned guardian ad litem, which appear to substantially overlap. All three professionals seem to agree that [Shane] engage in some sort of individual counseling, as well as engaging with Ms. Love and Ms. Trejo, as Afiniti's counselors, prior to then attempting therapeutic visitation with Afiniti. I concur with the independent mental health professional that I consulted, and believe the Court should give some deference to the position of Afiniti's counselors on when therapeutic visits can begin and progress to face-to-face visits at the frequency and under the terms as the Court sees fit.

The district court ultimately ordered that Shane undergo a parenting assessment prior to commencing any therapeutic parenting time with Afiniti.

In her GAL report, Jackson stated that she met with Jodi and Afiniti in the current juvenile case. Jackson's attempts to meet with Shane were unsuccessful as he failed to show up for their appointment on December 28, 2021, and she had been unable to contact him after that date. However, Jackson was familiar with Shane as she was currently the GAL for Shane's other children in their juvenile cases. Jackson stated that she "[had] seen much of the same behaviors from [Shane] in that case as we see with Afiniti's case"; "He has not consistently followed Court orders in the juvenile case and has not had a visit with his children since October of 2021." Jackson also stated:

> It is noteworthy to point out that the District Court found [Jodi] in contempt of court for denying visitation in its Order filed on November 30, 2020. The Court noted that while [Shane] did not consistently pursue visitation with Afiniti, he pursued it, nonetheless. The sanctions imposed by the Court was [sic] for [Jodi] to follow the modified parenting plan from December 1, 2020 to May 31, 2021. Given that [Shane] does not appear to have initiated the modified parenting plan, as required by the Court, we do not know if [Jodi] would have followed through on her end. However, this fact does cause pause for the undersigned in the discussion of termination of [Shane's] parental rights.
>
> . . . .
>
> According to my interview with [Jodi], [Shane] has not reached out for visits, paid child support, or initiated therapy with Afiniti since the Court's order. This is akin to the actions [Shane] is taking with his other two children, Natalya and Oshea [sic]. He is refusing to follow court orders to have his visits with his children and has made no effort to continue his relationship with them. This pattern of behavior is a concern that [Shane] will never decide to put his children first, including Afiniti. [Shane] did not follow through on providing the undersigned with any information to the contrary.
>
> Given the history in this case, coupled with [Shane's] current situation with his other children, it would appear that [Shane] has no intention of putting in the necessary work to build a relationship with Afiniti. He has not completed a parenting assessment,

- 11 -

contacted a therapist, provided for Afiniti financially, nor has he attempted contact with Afiniti in the last year since the Court's order. It is not in Afiniti's best interest to be left in limbo of whether her father will show up to reclaim his right to visitation, nor does it provide for a stable life for Afiniti.

Jackson recommended that the juvenile court grant the motion for termination of Shane's parental rights, however she reserved the right to change her recommendation upon evidence presented at trial.

At trial Jackson was asked if she believed terminating Shane's parental rights was in Afiniti's best interests. Jackson, replied, "I do." Jackson acknowledged that Afiniti was in a stable home -- which is different than a situation where a child is "lingering in foster care" -- however given "everything else," Jackson still believed termination was in Afiniti's best interests. She said that "what we've seen from Shane, at least in the last three years that I've known Shane, have [sic] been chaos." Jackson was concerned that Shane would continue to come in and out of Afiniti's life "and continue to attempt that contact without actually following the court order" and "contact won't ever get to that appropriate stage because [Shane] . . . won't put in the work to get to that appropriate stage"; he has not even done the necessary parenting assessment.

### (e) Shane's Criminal History

Evidence concerning Shane's criminal history was also given at trial. Exhibit 2 contains a transcript from a criminal case wherein on January 21, 2020, Shane was charged with "Theft By Receiving, Value More than $500.00 but less than $1,500.00," a Class I misdemeanor; he pled no contest and was sentenced to 12 months' probation and ordered to pay fines, costs, and fees (including drug testing fees). Exhibit 3 contains Shane's May 12, 2020, citation and complaint for "Criminal Mischief, Value $500.00 or Less," a Class III misdemeanor; the outcome of this citation does not appear in the exhibit. According to Jackson's testimony, Shane was charged with felony child abuse of Natalya and O'Shea when the 2021 juvenile cases were opened because both children tested positive for drug exposure. Although the victims are not named, exhibit 4 is a criminal case against Shane wherein on March 26, 2021, he was charged with two counts of felony child abuse, each a Class IIIA felony; he filed a motion to continue in that case on December 21, 2021. Jackson stated that Shane was charged with assault against a female in July 2021. Exhibit 5 contains a criminal case against Shane wherein he pled no contest to a third degree assault, a Class I misdemeanor, that occurred in July; he was sentenced to 4 days in jail. And according to Jackson, Shane was arrested "this morning" on a charge of possession of methamphetamine.

### 3. JUVENILE COURT'S DECISION

In a journal entry and order entered on May 25, 2022, the juvenile court found by clear and convincing evidence that statutory grounds for termination of Shane's parental rights to Afiniti existed pursuant to § 43-292(1), (2), and (4); however, the juvenile court found that § 43-292(9) (aggravated circumstances) had not been proven by clear and convincing evidence and the court failed to address § 43-292(3). The court also found that Shane was an unfit parent and that termination of his parental rights was in the child's best interests. Accordingly, the court terminated Shane's parental rights to Afiniti.

Shane appeals and Jodi cross-appeals.

## III. ASSIGNMENTS OF ERROR

Shane assigns only that the juvenile court erred in finding that termination of his parental rights was in Afiniti's best interests.

Jodi assigns on cross-appeal that the juvenile court erred in appointing an attorney to represent Shane "in a Divorce Modification matter."

## IV. STANDARD OF REVIEW

Termination of parental rights cases, even when raised under § 42-364(5), are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings. *Kitsmiller v. Kitsmiller*, 31 Neb. App. 473, 983 N.W.2d 147 (2022). See, also, *Kenneth C. v. Lacie H.*, 286 Neb. 799, 806, 839 N.W.2d 305, 311 (2013) ("[a]lthough this is not a typical juvenile case governed exclusively by the Nebraska Juvenile Code, . . . the standard of review applicable to juvenile cases is applicable here").

## V. ANALYSIS

### 1. STATUTORY GROUNDS FOR TERMINATION

Jodi sought to have Shane's parental rights to Afiniti terminated under § 43-292(1), (2), (3), (4), and (9). The juvenile court found that § 43-292(1), (2), and (4) existed by clear and convincing evidence. Shane does not challenge the court's finding of a statutory ground for termination of his parental rights to Afiniti, however, for the sake of completeness, we briefly review the court's finding.

Under § 43-292(1), a juvenile court may terminate parental rights when the parent has "abandoned the juvenile for six months or more immediately prior to the filing of the petition." Abandonment means a parent's intentionally withholding from a child, without just cause or excuse, the parent's presence, care, love, protection, and maintenance and the opportunity for the display of parental affection for the child. Neb. Rev. Stat. § 43-245(1) (Cum. Supp. 2020). Whether a parent has abandoned a child within the meaning of § 43-292(1) is a question of fact and depends upon parental intent, which may be determined by circumstantial evidence. *Kenneth C. v. Lacie H., supra*. To prove abandonment in determining whether parental rights should be terminated, the evidence must clearly and convincingly show that the parent has acted toward the child in a manner evidencing a settled purpose to be rid of all parental obligations and to forgo all parental rights, together with a complete repudiation of parenthood and an abandonment of parental rights and responsibilities. *Id.*

Here, Jodi filed her motion to terminate Shane's parental rights on September 1, 2021, meaning that the 6-month look-back period commenced on March 1.

There is evidence in the record that Jodi previously interfered with Shane's parenting time, as evidenced by the district court's order finding her in contempt. However, the court's journal entry and order dated November 30, 2020, which was further altered and amended in a journal entry and order dated February 18, 2021, gave Shane a clear path to reestablishing his parenting time with Afiniti. Pursuant to the February 18 journal entry and order, Shane was required to obtain a parenting assessment "prior to the commencement of any therapeutic parenting time" with

Afiniti; after completing the parenting assessment, Shane would progress to therapeutic and then daytime parenting. Despite being given the opportunity to reestablish his relationship with Afiniti, at the time of the termination hearing in January 2022, Shane still had not obtained the required parenting assessment, which was the first step to having parenting time with her. Additionally, Shane had not paid any child support for Afiniti since January 2021, nor had he sent her cards or gifts. Shane even refused to appear at the termination hearing after being given the opportunity to be transported back to the courtroom after his arrest that morning. Shane's actions, or lack thereof, show that he has acted toward Afiniti in a manner evidencing a settled purpose to be rid of all parental obligations and to forgo all parental rights, together with a complete repudiation of parenthood and an abandonment of parental rights and responsibilities.

Jodi has shown clearly and convincingly that § 43-292(1) exists as a statutory basis for terminating Shane's parental rights. And since any one of the bases for termination codified in § 43-292 can serve as the basis for termination, we need not consider the sufficiency of the evidence concerning any other statutory basis for termination. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). We next consider whether termination is in Afiniti's best interests.

## 2. BEST INTERESTS AND UNFITNESS

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This presumption is overcome only when the State has proved that the parent is unfit. *Id.* See, also, *Wayne G. v. Jacqueline W.*, 21 Neb. App. 551, 842 N.W.2d 125 (2013) (mother sought to have father's parental rights terminated). Although the term "unfitness" is not expressly stated in § 43-292, the Nebraska Supreme Court has said that it derives from the fault and neglect subsections of that statute and from an assessment of the child's best interests. *In re Interest of Mateo L. et al., supra*. See, also, *Wayne G. v. Jacqueline W., supra.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Leyton C. & Landyn C., supra.* The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.* We have previously set forth the evidence presented at the termination hearing, and we will not recount it again here.

Notably, Shane has not shown any interest in having a relationship with Afiniti following the district court's February 2021 order requiring him to undergo a parenting assessment prior to commencing therapeutic parenting time with her. In addition to not having any physical contact with Afiniti, Shane has failed to pay any child support since January 2021 and has not sent any cards or gifts to Afiniti. By the time of the January 2022 trial regarding Shane's parental rights, he had been wholly absent from Afiniti's life for nearly a year.

In his brief on appeal, Shane argues that there was "no evidence offered that [Afiniti] was being harmed by [his] parental rights remaining intact" because he "had no contact with [her] for

at least three years prior to the termination hearing," and any concern that Afiniti was traumatized by Shane was "extinguished by [his] lack of involvement" with her. Brief for appellant at 10.

However, both Jackson and Angel-Trejo testified that it would be in Afiniti's best interests to terminate Shane's parental rights. Jackson, who has had dealings with Shane since 2019 stated that what she had seen from him in the last 3 years had been "chaos." Angel-Trejo was concerned about Shane having any sort of contact with Afiniti before making any progress with his own issues. And the evidence shows that Shane has not made any effort at the required progress. The best interests of a child require termination of parental rights when a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time. *Wayne G. v. Jacqueline W., supra.* Jodi proved that Shane was unfit, meaning that he has a personal deficiency or incapacity which has prevented, or will prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to the children's well-being. See *In re Interest of Leyton C. & Landyn C., supra.* We further find that there is clear and convincing evidence that it is in Afiniti's best interests to terminate Shane's parental rights.

### 3. APPOINTMENT OF COUNSEL

In her cross-appeal, Jodi assigns that Shane should not have been provided a court-appointed attorney to represent him in a divorce modification matter. Citing to local rules and a state statute, Jodi contends that "[p]arties to a divorce are simply not entitled to court-appointed counsel." Brief for appellee at 19. She argues that it was only heard in the county court because the district court declined to accept jurisdiction after finding that the county court, sitting as a juvenile court, was a more appropriate forum.

Pursuant to § 42-364(5), "Whenever termination of parental rights is placed in issue the court shall transfer jurisdiction to a juvenile court established pursuant to the Nebraska Juvenile Code unless a showing is made that the county court or district court is a more appropriate forum"; "If no such transfer is made, the court shall conduct the termination of parental rights proceeding as provided in the Nebraska Juvenile Code." See, also, § 43-247(6) (juvenile court in each county shall have jurisdiction of proceedings for termination of parental rights). Accordingly, the juvenile court and the juvenile code control anytime there is a proceeding for the termination of parental rights. Under the juvenile code, when termination of parental rights is sought, the parent has a right to have counsel appointed if the parent is unable to afford to hire a lawyer. See Neb. Rev. Stat. § 43-279.01 (Reissue 2016). Therefore, the juvenile court did not err in appointing counsel to represent Shane in this matter.

Jodi further argued that due to the "error" by the juvenile court in appointing counsel for Shane, either Shane or Lincoln County should have to pay her attorney fees. She acknowledged that while she would "certainly have incurred fees in the initial presentation of her case," she claimed the fact that Shane received court-appointed counsel added to her fees because of the contested nature of the hearing and his appeal. Brief for appellee at 20. We have already found that the juvenile court did not err in appointing counsel to represent Shane. However, to the extent that Jodi still claims that the juvenile court should have awarded her attorney fees in this matter, she did not assign such as error. *Buttercase v. Davis*, 313 Neb. 1, 982 N.W.2d 240 (2022) (to be considered by appellate court, alleged error must be both specifically assigned and specifically argued in brief of party asserting error). And to the extent that Jodi seeks attorney fees on appeal,

she must follow the appropriate procedure as set forth in Neb. Ct. R. App. P. § 2-106(G) (rev. 2022).

## VI. CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Shane's parental rights to Afiniti. We further affirm the juvenile court's decision to appoint counsel to represent Shane.

AFFIRMED.